860 A.2d 190 (2004)
In re R.L.T.M., a Minor,
Appeal of Lancaster County Children and Youth Services, Appellant.
Superior Court of Pennsylvania.
Submitted February 9, 2004.
Filed October 4, 2004.
Anne L. Cooper, Lancaster, for appellant.
Jeffrey Gonick, Leola, Guardian Ad Litem, for appellee.
Lisa J. McCoy, Lancaster, for A.M., appellee.
Maurice T. McKinney, Higley, AZ, for M.T.M., appellee.
Before: LALLY-GREEN, BOWES and CAVANAUGH[*], JJ.
BOWES, J.:
¶ 1 This is an appeal by Lancaster County Children and Youth Social Service Agency (CYSSA) from the June 30, 2003 denial of its petition to terminate the parental rights of A.M. ("Mother") and T.M. ("Father")[1] to their son, R.L.T.M. For the reasons that follow, we affirm.
¶ 2 R.L.T.M. was born January 7, 1990. When he was three months old, he suffered a brain injury and subsequently was *191 diagnosed with cerebral palsy. CYSSA senior adoption caseworker Doris Risser explained the circumstances surrounding the diagnosis as follows:
The agency first became involved with the family in April of 1990. [R.L.T.M.] was three months old at that time. The initial report was received because [R.L.T.M.] suffered severe brain damage after he stopped breathing.
When he had been born, he weighed a little bit over four pounds. He was born in January of that year. There was supposed to be a heart monitor used to monitor [R.L.T.M.] at all times, and the monitor wasn't being used regularly. He was in the care of his father when he stopped breathing.
There are two stories. [Mother] told me that his father panicked and threw him against the wall and caused damage to his spinal cord, and the hospital reported to the agency that because the monitor wasn't used and he stopped breathing that was the cause of the brain damage and the cause of [R.L.T.M.] being borderline mentally retarded and having cerebral palsy. He was not born with mental retardation and cerebral palsy.
At that time, the agency became involved, but it was felt that [Mother] and [Father] were both going to go through the training and to learn how to properly care for the children. [Mother] also had the support of her mother at that time. So the case was not formally opened for services.
Q. Did the father continue to reside in the household after the injuries?
A. No. He left and he hasn't been involved with [R.L.T.M.] for a very long time.
After the first referral to the agency, there is no record of him being in the home.
N.T., 9/23/02, at 5-6.
¶ 3 On April 23, 1997, CYSSA received a report alleging medical neglect of R.L.T.M. by Mother. The agency eventually took the child into custody and placed him into foster care on May 19, 1999. On September 11, 2000, the goal of the family service plan was changed from reunification to adoption; Mother did not appeal that decision. The petition to terminate parental rights was filed on March 5, 2002. The common pleas court held hearings on May 16, 2002, and September 23-26, 2002, and ultimately denied the petition on June 30, 2003. This timely appeal followed.
¶ 4 CYSSA raises one issue for our review: whether the orphans' court abused its discretion in denying the petition to terminate parental rights based on its conclusion that termination did not serve R.L.T.M.'s needs and welfare. The orphans' court had concluded that CYSSA had sustained its burden of proof under 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8), but determined that R.L.T.M.'s bond with Mother, coupled with the child's limited intellectual capacity, militated against termination of parental rights.
¶ 5 Our scope and standard of review are settled. Whether the orphans' court grants or denies the petition to involuntarily terminate parental rights, "we are limited to determining whether the decision of the trial court is supported by competent evidence." In re C.S., 761 A.2d 1197, 1199 (Pa.Super.2000); see also Adoption of M.S., 445 Pa.Super. 177, 664 A.2d 1370 (1995) (Superior Court affirmed orphans' court's denial of petition filed pursuant to 23 Pa.C.S. § 2511(a)(1) and (2)).
Where the hearing court's findings are supported by competent evidence of record, "we must affirm the hearing court *192 even though the record could support an opposite result." In re Adoption of B.D.S., 494 Pa. 171, 177, 431 A.2d 203, 206 (1981) (quoting Matter of Kapcsos, 468 Pa. 50, 54, 360 A.2d 174, 176 (1976)).
....
In a proceeding to involuntarily terminate parental rights, the burden of proof is upon the party seeking termination to establish by "clear and convincing" evidence the existence of grounds for doing so. Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); In re T.R., 502 Pa. 165, 465 A.2d 642 (1983). The standard of "clear and convincing" evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue. Matter of Sylvester, 521 Pa. 300, 304, 555 A.2d 1202, 1203-04 (1989).
In re Adoption of M.S., supra at 1373 (quoting In re Adoption of Atencio, 539 Pa. 161, 165-66, 650 A.2d 1064, 1066 (1994)). Moreover, "It is clear that in a termination proceeding, the focus [initially] is on the conduct of the parents. In the Interest of A.L.D., 797 A.2d 326 (Pa.Super.2002); In the Interest of M.B., 449 Pa.Super. 507, 674 A.2d 702 (1996)." In the Matter of B.L.W., 843 A.2d 380, 383 (Pa.Super.2004).
¶ 6 The court herein refused to terminate parental rights. Initially, the court found that CYSSA proved, based upon 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8), that R.L.T.M. has been without proper parental care and control. Those sections provide as follows:
§ 2511. Grounds for involuntary termination
(a) General rule.The rights of a parent in regard to a child may be terminated after a petition on any of the following grounds:
(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
....
(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.
....
(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination *193 of parental rights would best serve the needs and welfare of the child.
The court then stated as follows:
Upon careful consideration of the testimony presented in this matter, I reached the conclusion that the Agency sustained its burden of proof concerning the four grounds for terminating the parental rights. There can be little doubt that for a period in excess of a year that the child has been in placement and has been without proper parental care and control from either the father or the mother. Nevertheless, the fact that the Agency has established any one or all of the four grounds does not end my inquiry. I must engage in an analysis which assesses whether termination of parental rights is in the best interest of the child.
Trial Court Opinion, 9/12/03, at 3.[2] Thus, although the court found that the statutory requirements were met for termination of parental rights, it concluded that the child's best interests compelled that Mother's rights should not be terminated based upon the significant bond shared by Mother and son. This evaluation by the orphans' court is based upon 23 Pa.C.S. § 2511(b), which provides, "The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." Unlike 23 Pa.C.S. § 2511(a), subsection (b) "centers judicial inquiry upon the welfare of the child rather than the fault of the parent. In re Angry, 361 Pa.Super. 180, 522 A.2d 73, 75 (1987)." In re A.R., 837 A.2d 560, 565 (Pa.Super.2003). One commentator has stated:
The best interests of the child may not be separately considered by the court until a finding has been made that the statutory requirements for termination of parental rights have been met. The determination of the best interests of the child is a separate consideration and is not necessarily dictated by a finding that the statutory elements for termination are present. In terminating a parent's rights involuntarily, the court must consider the developmental, physical, and emotional needs and welfare of the child.
Wilder, Pa. Family Law Prac. and Proc. (5th ed.), § 32-6 (footnotes omitted).
¶ 7 CYSSA argues that the orphans' court abused its discretion by denying the agency's petition based upon its conclusion that termination of Mother's parental rights would not serve the needs and welfare of R.L.T.M. Our review of the record compels our disagreement.
¶ 8 The trial court relied upon the psychiatric attachment evaluation, or bonding assessment, performed by Cheryl Walters of Life Management Associates. In addition to performing psychological testing of R.L.T.M., Ms. Walters conducted interactive interviews with R.L.T.M. and his foster mother and also with the child and Mother. The court concluded:
Ms. Walters reached one conclusion with no apparent hesitancy: [R.L.T.M.] clearly has a stronger attachment with his birth mother than with his foster mother. Numerous positive qualities were noted in the attachment between [R.L.T.M.] and [Mother]. (Psychological Attachment Evaluation at p. 31). Ms. Walters acknowledged the obstacles to the relationship between mother and child. Ultimately, she concluded that, "Despite the difficulties and disruptions *194 in their relationship, he continues to have a positive attachment to her. He views her as his parental figure. There was no indication he wants to or would easily view other parental figures in a similar manner. There appeared to be more than a shared relationship involved in their interaction and [R.L.T.M.'s] overall desire was to not only spend time with his birth mother, but be reunited with her." (Psychological Attachment Evaluation at p. 32).
Ms. Walters also noted that [R.L.T.M.'s] limited intellectual capacity also militates against terminating parental rights. Given his moderate mental retardation, she questioned whether he would be able to understand the termination of parental rights. As [R.L.T.M.] would not understand the rationale behind the termination of parental rights, the mourning and loss he would experience would likely be significant. [R.L.T.M.] may be hampered in dealing with this, given his very elementary ability to identify and express feelings. (Psychological Attachment Evaluation at p. 33).
Trial Court Opinion, 9/12/03, at 4.
¶ 9 While maintaining that the trial court abused its discretion in concluding that termination of Mother's parental rights would not serve [R.L.T.M.'s] needs, CYSSA nevertheless spent the greater portion of its argument on how Mother failed in the performance of parental duties and in meeting the goals of the family service plan, focusing on Mother's consistently poor record of attendance at visits with her son. Appellant's brief at 10-12. We reiterate that the trial court concluded that CYSSA sustained its burden of proof concerning the statutory grounds for termination. Therefore, Mother's poor attendance at visits with R.L.T.M. is not significant for purposes of assessing the child's bond with Mother, except to the extent that the absence of visits might adversely affect the development of a significant bond; however, the agency does not make such a claim.
¶ 10 CYSSA focuses upon the requirements of the Adoption and Safe Families Act (AFSA), 42 U.S.C. § 675, and Act 126 which amended the Juvenile Act, 42 Pa.C.S. § 6301 et seq., to support its petition. While Mother has not completed the family service plan for R.L.T.M.'s return home in the four years since he has been in foster care, and federal and state law may prefer adoption if family reunification cannot be achieved in a timely fashion, each child is unique and each situation must be evaluated on its own facts. As we stated in In re P.A.B., 391 Pa.Super. 79, 570 A.2d 522, 525 (1990), "If, as here, ties with natural parents are present and are an active force in the child's life, then needs and welfare [become] a concept that argues against termination rather than fosters it."
¶ 11 Here, the child lived with Mother for nine years. N.T., 9/23/02, at 5, 21. Ms. Walters noted the significance of this fact in her report and opined, "Although difficulties were clearly present which necessitated foster care involvement, some positive aspects of the parent-child relationship must have occurred between R.L.T.M. and his birth mother." Psychological Attachment Evaluation at 32. Moreover, the trial court was impressed with the thoroughness of Ms. Walters's report and the comprehensiveness of her analysis. Ms. Walters concluded:
Based on this psychological attachment evaluation, [R.L.T.M.] continues to have a positive attachment with his birth mother and views her and members of her family as his family, despite all that has occurred. His functioning reveals the positive aspects of their attachment *195 relationship. Although this is not the only factor in determining whether or not he would be negatively effected by a termination of parental rights, given [R.L.T.M.'s] significant intellectual limitations, it is questionable as to whether or not he would understand the concept involved and whether he would be able to identify and express his feelings appropriately regarding mourning and loss issues if parental rights were terminated. [R.L.T.M.] is twelve years of age chronologically, however, intellectually, it would be difficult for him to make an informed decision about being adopted by another family. Consequently, there is the potential [R.L.T.M.] would be detrimentally affected if all contact were discontinued with his birth mother. Therefore, it would not be recommended termination of parental rights occur, with a goal toward adoption, as this would likely not be in [R.L.T.M.'s] best interest psychologically.
Psychological Attachment Evaluation at 33-34.
¶ 12 Examination of this evaluation, and the orphans' court's careful consideration of the bond between Mother and son, is exactly the level and extent of the searching inquiry that our Supreme Court requires of this most sensitive matter. In In re E.M., 533 Pa. 115, 122, 620 A.2d 481, 485 (1993), the Court stated,
It is clearly conceivable that a beneficial bonding could exist between a parent and child, such that, if the bond were broken, the child could suffer extreme emotional consequences .... Whether the bond exists to such a considerable extent that severing the natural parent-child relationship would be contrary to the needs and welfare of the children is an issue that must be more fully explored by the evidence.
See also In re Adoption of A.C.H., 803 A.2d 224 (Pa.Super.2002) (court must consider emotional bond when analyzing whether termination serves needs and welfare of child).
¶ 13 CYSSA argues that although R.L.T.M. was happy when he saw Mother during visits, he "is always happy to see people. He likes people." Appellant's brief at 12. However, Ms. Walters addressed this contention in her report. She concluded that even though the child appeared to enjoy the company of, and communicating with, the examiner, one of the CYSSA representatives, and foster mother, R.L.T.M. clearly and consistently indicated his desire for Mother and spoke to her of his love for her. See Psychological Attachment Evaluation at 31. Ms. Walters clearly relied on R.L.T.M.'s spontaneous affirmations of his love for his mother in determining that a significant bond exists between Mother and son.
¶ 14 The orphans' court, as the fact-finder, could accept or reject the testimony of any witness, in whole or in part; the weight accorded to the evidence was within the province of the orphans' court. In re G.P.-R., 2004 PA Super 205, 851 A.2d 967. As we conclude that the record supports the orphans' court's conclusion and provides competent evidence that the needs and welfare of R.L.T.M. are best served by maintaining the connection with Mother, we therefore affirm. See In re A.R., supra (termination cannot occur if it does not serve the needs and welfare of the child.).
¶ 15 Order affirmed.
NOTES
[*] Judge Cavanaugh did not participate in this decision.
[1] Father has no involvement with R.L.T.M. and is not a party to this appeal.
[2] The quoted portion of the trial court opinion appears on what would be page three if the pages had been numbered.