**In re L.S.**

---

64. *McMahon*, 612 A.2d at 1364.

C.P. of Bucks County, no. 2010-9111.

*Brad M. Jackman,* for
*Sarah Tucker,* guardian ad litem.
*Daniel M. Keane,* for
*Dawn E. Padanyi,* for

GILMAN, *J.*, February 9, 2011—

## INTRODUCTION

Bucks County Children and Youth Social Services agency (hereinafter referred to as the "agency") has appealed our November 30, 2010 decree denying its petition to terminate the parental rights of A.C.S. (hereinafter referred to as "mother"), the natural mother of L.S. (hereinafter referred to as "child"). A hearing was initially conducted on August 31, 2010[1], and upon agreement of all counsel, we entered an order dated September 1, 2010 continuing the hearing until November 30, 2010, when additional testimony was to be presented. Thereafter, a lengthy evidentiary hearing was held on November 30, 2010.

## BACKGROUND

The relevant facts and procedural history of this case are as follows: L.S., a female, was born to mother on September 27, 2008. Mother testified that child was detoxed with the use of morphine after birth. Mother explained that this was necessary because she was using Percocet and marijuana as of the time when L.S. was born (N.T. 8/31/2010, pp.4-5). L.S. was removed from mother's home by the agency three (3) days after she was discharged from the hospital, which was approximately one (1) month after she was born. Mother's testimony indicates her belief that there was a safety plan put in place by the agency, prior to the child's removal, which stipulated that mother would have custody of L.S. and that mother's parents would serve as supervisors. However, shortly after child was discharged from the hospital to mother's home, mother received a phone call from her caseworker stating that the

---

1. A Confirmation of consent to adoption concerning L.S. was signed by putative father, J.H., following a hearing on August 31, 2010.

agency had received an anonymous tip regarding drug use and violence in the home, and that, accordingly, child was being removed. (N.T. 8/31/2010, p.8)[2]. Child was in one foster home briefly and has resided in her present foster home since May, 2009. (N.T. 11/30/2010, p.31).

On June 10, 2010, the agency filed a petition to terminate mother's parental rights and a hearing was fixed for August 31, 2010. The agency pursued termination under 23 Pa.C.S. §2511(a)(2), (5), and (8), which provides in pertinent part as follows:

(a) General rule. — The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of

---

2. Although at the hearing mother responded to questions by the agency indicating that she was familiar with the allegations in the petitions for dependency, (N.T. 8/31/2010, pp.8-9), this court was not given the opportunity by the agency or other parties to become familiar with the complete record, or even pertinent parts thereof, made in front of the dependency court. Accordingly, we can only rely on references and inferences therefrom made by counsel and witnesses at the termination hearings.

the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

## APPELLANT'S STATEMENT OF ERRORS COMPLAINED OF ON APPEAL

Appellant agency filed a notice of appeal, accompanied by a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2), which we repeat verbatim, as follows:

1. The learned trial judge erred in failing to find that appellant met its statutory burden in proving that grounds exist to involuntarily terminate the parental rights of A.S.

2. The learned trial judge erred by failing to find that the termination of parental rights of A.S. best serves the needs and welfare of L.S.

3. The learned trial judge erred by entering a decision

that was against the weight of the evidence.

4. The learned trial judge erred by abusing his discretion.

## STANDARD OF REVIEW

In a termination of parental rights hearing, our duty is to determine whether the statutory grounds for termination of parental rights have been met and, if so, to then determine whether the termination of parental rights serves the best interest of the child. 23 Pa.C.S. §2511.

As the party seeking termination, the agency bore the burden of establishing by clear and convincing evidence that grounds existed for terminating mother's parental rights. Clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *In re Z.P.* 994 A.2d 1108, 115-116 (Pa. Super. 2010)(internal citations omitted), *In re J.D.W.M.*, 810 A.2d 688, 690 (Pa. Super. 2002).

In cases involving termination of parental rights and an appeal from a decree of the trial court, the standard of review employed by the appellant courts is limited to determining whether the decision of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child. As the finder of fact, the trial court is the sole determiner of the credibility of witnesses, and all conflicts in testimony are to be resolved by the finder of fact. Our findings are entitled to reasonable deference and absent an abuse of discretion, an error of

106

law, or insufficient evidentiary support, the decree must stand. *Id.* at 1115-1116 (internal citation omitted).

Appellate courts employ a broad, comprehensive review of the record in order to determine whether a trial court's decision is supported by competent evidence, and will uphold a decision if any proper basis exists for the result reached. If the trial court's findings are supported by competent evidence, the appellate court must affirm the trial court's decision, even if the record could support an opposite result. *Id., In re R.L.T.M.*, 860 A.2d 190, 191-192 (Pa. Super. 2004).

## DISCUSSION

The following legal principles are implicated when the trial court is called upon to decide whether or not to grant a petition to involuntarily terminate a parent's rights:

"[T]he complete and irrevocable termination of parental rights is one of the most serious and severe steps a court can take, carrying with it great emotional impact for the parent and the child." *In re C.P.* 901 A.2d 516, 520 (Pa. Super. 2006). "Because of the importance placed on the family unit, governmental intrusion into the family, and disruption of the parent-child relationship, is warranted only in exceptional circumstances," and "only upon a showing of clear necessity." Even when such intrusion is necessary to protect the children, every possible effort must be made to reunite the family. In addition, "all circumstances must be considered when analyzing a parent's performance or non-performance of parental obligations. A parent's performance must be measured in light of 'what would be expected of an individual in circumstances which the parent under examination finds

himself.'" *In re Matsock*, 611 A2.d 737, 742-743 (Pa. Super. 1992) (internal citations omitted).

To reach a determination, the initial focus of the termination proceeding is on the conduct of the parent and whether his or her conduct justifies termination of parental rights pursuant to the pertinent statutory provisions. *In re B.L.L.* 787 A.2d 1007 (Pa. Super. 2001). If the statutory grounds for termination are established, then the welfare of the child becomes the court's paramount consideration. Courts must reflect on whether termination will best serve the child's needs and welfare. 23 Pa.C.S. §2511(a) and (b).

Section §2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), the Superior Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." Appellate courts have instructed that "the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* "[T]he extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." *In re K.Z.S.* 946 A.2d 753, 763 (Pa. Super. 2008). In performing a "best interests" analysis:

> The court should also consider the importance of continuity of relationships to the child, because severing close parental ties is usually extremely painful... The court must consider whether a natural parental bond exists between child and parent, and whether

termination would destroy an existing, necessary and beneficial relationship. Most importantly, adequate consideration must be given to the needs and welfare of the child. *Id.* At 760 (internal citations omitted). *In re I.J.* 972 A.2d 5, 12 (Pa. Super. 2009)

Parental responsibilities encompass affirmative duties. They require continuing interest in the child and a genuine good faith interest and effort to maintain communication and association with the child, even in difficult circumstances. *In re Z.P.*, supra. "...[A] parent's basic constitutional right to the custody and rearing of his or her child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B.N.M.* 856 A.2d 847, 856 (Pa. Super. 2004), appeal denied, 872 A.2d 1200 (Pa. 2005). The particular circumstances of a case must be considered as well as all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination. *Id.*

In this case, pursuant to §2511(a)(2), the agency was required to prove by clear and convincing evidence mother's repeated and continued incapacity, abuse, neglect or refusal to provide child with essential parental care, control or subsistence necessary for physical or mental well-being, and that the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by mother. Similarly, under (a)(5) the agency was required to demonstrate clearly and convincingly, that mother cannot or will not remedy the conditions that led to the removal of L.S., within a reasonable period of time.

We determined that the agency did not offer clear and convincing evidence to support termination under either subsection.

The following pertinent facts were developed at the August 31, 2010 and November 30, 2010 evidentiary hearings: The record reflects that the agency's concerns regarding mother's parenting stemmed from issues related to housing, drug use, and mental health. Mother has lived with her parents and intends to continue doing so for the foreseeable future (N.T. 11/30/2010, p. 136). During the hearing, mother was repeatedly questioned about and repeatedly testified as to her parents' financial difficulties pertaining to potential foreclosure upon her parents' home. We found mother testified credibly and informatively as to alternatives which might remedy the situation, either providing for the opportunity to remain in the current family home or to relocate to another residence provided by a family friend (N.T. 8/31/2010, pp. 33-34, NT. 11/30/2010, pp. 14-15, 33, 62-63, 122-123). The fact that the family has faced difficult economic times is, unfortunately, far from unique at the present time, and does not represent clear and convincing evidence that mother cannot provide safe and stable housing for L.S., her child.

Mother testified that she has been drug-free since March of 2010. Although addressed throughout the record, when asked specifically what resources are currently in place to assist mother in maintaining her sobriety, she testified to attendance at NA and AA meetings, the support of family and friends, her caseworker with the Bucks County Drug and Alcohol Commission (N.T. 11/30/2010, pp. 130-131), and a treatment plan to be established through Livingren, a drug and alcohol facility. The agency made countless

efforts during the hearing to have the trial court find that the mother has intentionally avoided drug testing. The agency also argued that on certain visitations with child, when mother was not feeling well, we should presume that she was using drugs. We found mother's testimony with regard to these issues, wherein she denied intentionally avoiding drug testing, and she denied drug usage at the time of visitations with her daughter, to be sufficiently credible so as to rebut the agency's position.

The focus of the testimony elicited by the agency as to mother's mental health was on mother's efforts to participate in and complete a mental health and psychiatric medication evaluation during the three (3) month period of time between the two (2) hearing dates in 2010. (N.T. 11/30/2010, pp. 5-10, 74-91, 146-150). While the agency was anxious to point out that as a matter of law, the court is not to consider mother's efforts to rectify parenting deficiencies which take place subsequent to her being served with the petition (presumably in June, 2010), the agency's examination of mother at the second hearing on November 30, 2010 substantially focused on the mental health evaluation which mother had not completed during that time period.

When the initial hearing was continued on August 31st, 2010, the agency noted that, statutorily, mother's efforts subsequent to service of the termination petition were not relevant to the merits of the petition. We strongly cautioned mother at that time that she should not assume that her parental efforts during the period between hearings guaranteed her future success on the merits. At the same time, we urged her to take full advantage of the period of time being afforded her, to address mental health,

drug and/or alcohol, and living arrangement issues. (N.T. 8/31/2010, pp. 38-40).

We recognized on August 31, 2010, as well as on November 30, 2010, that 23 Pa.C.S. §2511(b) states "... The court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." While the agency has not claimed that we erred in considering such efforts by mother, and has therefore waived any such claim, we note that our decision denying the agency's petition was not based on any remedial efforts made by mother which were first initiated subsequent to her receiving notice of the agency's petition to terminate her parental rights as to child.

At the second hearing, mother testified extensively as to why the date of November 24, 2010, previously scheduled as the evaluation date by Penndel Mental Health Clinic, was rescheduled due to a conflict for the mental health professional conducting the evaluation. The delay was not due to fault on the part of mother (N.T. 11/30/2010, pp. 5-7, 125). The appointment was rescheduled to January 20, 2011 (N.T. 11/30/2010, p. 125).

Therefore, with regard to the issue of mother's mental health, we are guided by the case law which instructs us to look to the particular circumstances of a case, and to consider all explanations offered by the parent facing termination of his or her parental rights to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination. *In re B.N.M.*, supra. We found that mother testified credibly as to her persistent efforts to establish and maintain the counseling

and mental health evaluations that the agency required. This was true throughout child's time in foster care, and was not just initiated by mother between the two hearing dates for this termination proceeding in the Summer and fall of 2010. Mother's testimony as to the distance she traveled to complete her obligations, and her efforts in establishing and following up with various appointments, was credible in light of all of her circumstances.

The requirements contained within subsections (a)(2) and (a)(5) of §2511, then, were not established clearly and convincingly by the agency to support its petition to terminate. The evidence proffered by the agency did not establish that mother continued to be incapable or neglectful as child's parent, and there was absolutely no claim that she was abusive or that she refused to perform her parental obligations. Similarly, there was no credible evidence that that conditions and causes of mother's alleged parental incapacity or neglect cannot or will not be remedied by her.[3]

The agency also invoked subsection (a)(8) in its petition to terminate mother's parental rights. Pursuant to (a)(8), the agency is required to clearly and convincingly establish three (3) elements: (1) child was removed from mother's care for at least twelve (12) months; (2) the conditions that led to the removal or placement of child continue to exist; and (3) termination of mother's parental rights would best serve the needs and welfare of child. As is true with subsection (a)(5), we find that the agency did not meet its burden of demonstrating by clear and

---

3. We note that the first requirement of subsection (a)(5) was established by the agency; that is, that child had been removed from the care of parent by the court for a period of at least six (6) months.

convincing evidence that the second and third elements have been satisfied.

Certainly, the first element was proven, since child has been removed by the court from the care of mother for well over twelve (12) months. As to the second element, for all of the above-mentioned reasons, we found that the agency did not prove a parental disqualifying housing issue or a credible present and continuing drug and alcohol issue with regard to mother which would warrant termination of her parental rights. Additionally, we found mother credible in her testimony regarding consultation and treatment for her mental health issues.

We recognize that application of subsection (a)(8) considers whether reunification between mother and child can be contemplated to be "imminent" as of the time of the termination hearing. The Superior Court has recognized the harshness of this subsection in circumstances where parents have made significant strides, yet the conditions that led to removal of a child still exist. *In In re I.J.*, 972 A.2d 5 (Pa. Super. 2009), the trial court credited the parents as having made significant strides toward remedying the conditions that had led to the child's removal, however, it was clearly a parental remedy of "some" but by no means "all" of such conditions. In that case, the Superior Court, reversing the trial court, held that the record "unambiguously reflects that all of the conditions have not been remedied and that reunification between I.J. and her parents remains untenable after nearly two years of foster care." Accordingly, the Department of Human Services was found to have met its burden. In contrast, the record in the present case cannot be found to be unambiguous with regard to rectifying conditions which led to child's removal.

In fact, the record here points to mother substantially, if not completely, remedying all parental conditions which led to child's removal in the first place; most importantly, drug abuse.

Finally, turning to the third element of subsections (a) (8), and (a)(5), the agency is required to demonstrate that the termination of mother's rights would best serve the needs and welfare of L.S. The agency failed to do so.

We heard testimony from Kristina DeCesare, who is employed as an intensive services caseworker for the agency and has been assigned to L.S.'s case since September 2009 (N.T. 11/30/2010, pp. 11-12). Ms. DeCesare testified that she has had occasion to observe some of mother's visits with child, which are arranged through Bethanna Visitation Services (hereinafter referred to as "Bethanna"). She testified that mother has visited with L.S. on a regular basis (N.T. 11/30/2010, p. 35). Ms. DeCesare also testified that she is familiar with the standards Bethanna utilizes to evaluate parents after a visitation. The evaluation is based upon a numeric scale where "two" represents a satisfactory rating and "three" represents a rating of exceptional. Ms. DeCesare testified that during the entire time child has been in care of the agency, mother has consistently been rated with "twos" and "threes." A majority of mother's ratings were exceptional, and none were below the satisfactory category. Almost never did the mother receive a "one," which would have signified she "needs improvement" (N.T. 11/30/2010, pp. 36-39).

Ms. DeCesare testified to an attachment between L.S. and mother, and distinguished that from a "bond" (N.T. 11/30/2010, p. 54). When asked by this court to

further explain the distinction she testified as follows: "Attachment is that there is a recognition. This is a person that I know, that I do fun things with, that I play with. I'm not scared of this person. I'm comfortable with this person. A bond to me goes further than that. I depend on this person. I - this person meets my needs, and if they're not there, I'm scared, I'm concerned, I don't feel safe" (N.T. 11/30/2010, p. 58). Ms. DeCesare testified that she based this opinion on her impression that L.S. "does not appear to be distressed when leaving the visits with [mother]. She's not clingy. She leaves the visits easily...I don't see her having the connection with [mother] that she does with her foster parents. She goes to her foster parents for care and comfort and is clearly bonded with them" (N.T. 11/30/2010, pp. 57-58).[4]

We also heard testimony from Christine Melton, the visitation social worker employed by Bethanna. At the behest of the agency, Ms. Melton has supervised mother's visits with L.S. since July, 2009, and she noted that mother and L.S. were involved with Bethanna prior to Ms. Melton's own involvement (N.T. 11/30/2010, p. 95). Ms. Melton testified not only to the fact that mother consistently was rated a two/satisfactory and three/exceptional in her evaluations, as explained above, but Ms. Melton also testified about the specific interactions between mother and L.S. during their visits. Mother's consistently high ratings in her visits with child

---

4. One can also readily argue the opposite viewpoint; that is, it can be argued that if a child is distressed upon leaving a visitation, it is due to an unsettled visit with a parent. Here, where the testimony indicates the child is very happy throughout her visits and is excited to see mother, and is loving at the end of visits, it can reasonably be inferred that this exemplifies a positive, bonded relationship between child and mother.

were based in part on elements such as greeting child warmly, planning appropriate activities, speaking to child with an appropriate tone of voice and about appropriate issues, conducting herself in such a manner as to provide safety and nurturing in her physical contact with child, appropriately supporting child's physical needs, and ending their visits together in a positive way (N.T. 11/30/2010, pp. 105-111).

The record also reflects that L.S. refers to mother as "mommy." L.S. happily greets mother, hugs and kisses her, and interacts positively with her during their visits. Child also greets her grandparents, mother's parents, happily when she is along for the ride when mother is driven home after their visits (N.T. 11 /30/2010, pp. 112, 118).

Mother's conduct has consistently demonstrated her passionate desire to be reunited with child. Additionally, mother testified thoroughly and credibly about child's development, giving examples of child reciting numbers and colors, and how they enjoy books and puzzles together. Mother spoke of child's milestones from when child first sat up and first held a bottle. Mother not only attends her weekly visitations, she has also participated in her parenting meetings, missing only a small number, with credible explanations for doing so. Mother attends child's doctor visits, she communicates with the foster parents, she testified that she does not associate with drug users any longer, she has attended some counseling at Aldie Foundation and she attends NA and AA meetings at Scottsville Church (N.T. 11/30/2010, pp. 120, 130-131). All of these actions are indicative of mother's efforts to be an appropriate parent, and to be reunited with child. While

certainly not perfect, mother's conduct has demonstrated a consistently serious intent to prove she can adequately and appropriately perform her parental duties.[5]

The agency did not prove that termination would best serve the needs and welfare of child. The agency argued the position that "you can't be bonded when you're a once a week parent" (N.T. 11/30/2010, P. 173).[6] We disagree. We were impressed not only with how productively mother uses her visitation time with child, but also with mother's attendance at child's doctors' visits, and with mother's efforts to communicate with foster parents. Mother has attempted to do far more with the limiting parameters placed upon her by the agency than simply showing up once a week for a visit. We found that mother does have a bonded relationship with child, and that terminating her rights would sever a relationship that is beneficial to child. We based this conclusion not only on mother's own testimony, but on the testimony of the agency's caseworker, along with the testimony of the Bethanna visitation social worker.

Mother has consistently maintained her weekly visitation with L.S., which by all accounts has been noted to be positive and constructive. We found the evidence of mother's parenting efforts to be consistent and

---

5. While L.S. may well have a bonded relationship with her foster parents, this does not preclude her having a bonded relationship with mother, as well. (N.T. 11/30/2010, pp.31-33). Our role is to consider the effect of terminating child's bond with mother. *In re Adoption of J.M.* 991 A.2d 321 (Pa. Super. 2010).

6. We would be remiss if we failed to note the "Catch-22" element of agency's argument. It strikes us as less than fair to argue that a parent's bond should be terminated due to lack of bonding time, when the agency itself bears some responsibility for precluding bonding time for mother and child.

compelling, not just for the time periods between the two (2) hearing dates in 2010, or since the termination petition was first filed in June 2010, but at least since the Bethanna visitations began in March, 2009. Mother has focused her efforts on being drug and alcohol-free, maintaining employment, and, to the best of her ability, to have a positive impact on her housing situation with her parents.

Although the record reflects occasional inconsistencies and conflicting accounts between the agency and mother, we found they were insignificant. We found mother has made significant efforts to coordinate and participate in counseling and evaluations relevant to her mental health and drug history issues. She has not refused assistance nor has she absolutely denied that she has issues which need attention. Mother, currently age twenty-three (23), has demonstrated persistent efforts to appropriately perform parental duties and to be reunited with her now two (2) year old child. The agency did not demonstrate that the conditions which led the agency to remove child from the mother's home more than two (2) years ago continue to exist.

## CONCLUSION

For all of the foregoing reasons, we denied the agency's petition to involuntarily terminate mother's parental rights as to child. Our decision is neither against the weight of the evidence, nor does it represent an abuse of discretion. The agency failed to meet its burden of demonstrating by clear and convincing evidence that statutory and decisional law grounds exist for termination, or that termination would best serve the needs and welfare of child.