J-S45015-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: S.E.J., A MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: I.A.J., FATHER, | |
| Appellant | No. 517 EDA 2014 |

Appeal from the Order January 8, 2014
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): CP-51-DP-0001379-2011, DP-51-AP-0000710-2013

BEFORE:  BOWES, WECHT, and FITZGERALD,[*] JJ.

MEMORANDUM BY BOWES, J.:                    **FILED AUGUST 13, 2014**

I.A.J. ("Father") appeals from the order entered January 8, 2014, wherein the trial court involuntarily terminated his parental rights to his five-year-old daughter, S.E.J.[1]  We affirm.

On June 14, 2011, the Philadelphia Department of Human Services ("DHS") investigated a General Protective Services ("GPS") report alleging that D.D. ("Mother") had been involuntarily hospitalized for mental health treatment following a psychotic episode.  The report further alleged that Mother chronically abused drugs, angered easily, yelled at the children, and physically abused S.E.J.'s older half-sister.  The report was substantiated.

_____

[*]  Former Justice specially assigned to the Superior Court.

[1]  On the same date, the trial court terminated the parental rights of S.E.J.'s mother.  We address the mother's appeal separately.

Father was not involved with the family at that juncture. He resided with his father ("Paternal Grandfather"). Following Mother's hospitalization, maternal grandmother initially cared for S.E.J. and the older half-sister. However, on July 7, 2011, the children were removed from maternal grandmother's care and started to reside with their maternal aunt, K.S. Then, during March 2012, they were relocated to a pre-adoptive foster home. They have remained together throughout DHS's involvement.

Meanwhile, approximately one month after DHS opened the GPS report, the juvenile court adjudicated S.E.J. and her sister dependent pursuant to 42 Pa.C.S. § 6302(1) involving children who are without proper parental care or control. Father attended the hearing and expressed his desire to care for his daughter and her half-sister at Paternal Grandfather's home. DHS performed a home assessment, approved the proposed placement, and initiated a transition plan. The plan was thwarted, however, after Father was arrested and incarcerated on a probation detainer. He has remained incarcerated since that time.

DHS fashioned a family service plan ("FSP") for Father even though he remained incarcerated. Father's objectives included contacting the agency so that it could determine what services Father could obtain while incarcerated. DHS mailed the FSP to Father, and it later corresponded with him in prison. The caseworker twice attempted to contact Father's prison counselor, but her efforts were fruitless. However, DHS was able to contact Father directly and eventually created the additional FSP objectives that

Father was to participate in parent training and drug and alcohol treatment while incarcerated.

Likewise, the agency that administered S.E.J.'s foster care, Jewish Family and Children Services ("JFCS"), drafted an individual service plan ("ISP") that mirrored Father's FSP objectives. The agency explored providing supervised visitations between Father and S.E.J. at the prison, however, Father rejected that idea based upon his daughter's kidney condition. Father's compliance with the FSP and ISP goals was modest. He maintained contact with DHS and JFCS, and while he alleged that he completed parent classes and substance abuse treatment in prison, he failed to provide any written documentation to substantiate that claim.

On December 20, 2013, DHS filed petitions for the involuntary termination of Father's parental rights to S.E.J. and to change her placement goal to adoption. Following a hearing on January 8, 2014, the trial court terminated Father's parental rights to S.E.J. pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5) and (8) and (b). This timely appeal ensued. Father complied with Pa.R.A.P. 1925(a)(2)(i) by filing a concise statement of errors complained of on appeal simultaneously with his notice of appeal.

Father presents two questions for our review:

> 1. Did the trial court err in determining that DHS presented clear and convincing evidence that grounds for involuntary termination exist?

2.    Did the trial court err in determining that the best interest of the child would be served by terminating Father's parental rights?

Father's brief at 5.

We review the trial court's order to grant or deny a petition to involuntarily terminate parental rights for an abuse of discretion. *In re C.W.U., Jr.*, 33 A.3d 1, 4 (Pa.Super. 2011). "We are limited to determining whether the decision of the trial court is supported by competent evidence." *In re R.L.T.M.*, 860 A.2d 190, 191 (Pa.Super. 2004) (quoting *In re C.S.*, 761 A.2d 1197, 1199 (Pa.Super. 2000)). However, "[w]e must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence." *In re C.W.U., Jr.*, *supra* at 4. If the trial court's findings are supported by competent evidence of record, we must affirm even if the record could support the opposite result. *In re R.L.T.M.*, *supra* at 191-192.

Although it is not apparent from his statement of questions presented, Father's primary complaint is that DHS did not utilize reasonable efforts to reunify him with his daughter. He argues that DHS ignored his request that S.E.J. reside with Paternal Grandfather and delayed securing the required FBI clearances. He also asserts that DHS failed to keep track of Father's accomplishments while in prison, and faults the agency for failing to make contact with his prison counselor. In sum, Father complains that the foregoing examples demonstrate DHS's deficient reunification efforts. We reject this position.

Initially, we observe that DHS's efforts are irrelevant to the determination of whether the agency established the statutory grounds to terminate Father's parental rights. We recently reiterated, "the focus of a termination proceeding is on the parents' conduct, and the adequacy of the agency's reunification efforts is not a valid consideration . . . Thus, [an agency's reunification effort's] alone is not a basis to disturb [a] trial court's order terminating . . . parental rights." *In re A.D.*, __A.3d __, 2014 WL 2566284 (Pa.Super. 2014) citing *In re B.L.W.*, 843 A.2d 380, 384 n.1 (Pa.Super. 2004) (*en banc*) ("the adequacy of CYS's efforts toward reunification is not a valid consideration at the termination of parental rights stage, as the law allows CYS to give up on the parent once the service plan goal has been changed to adoption") (internal quotes and brackets omitted).

However, that conclusion does not end our examination of Father's argument. While DHS's efforts are not pertinent to our review of the statutory grounds for termination, the agency's effort is relevant to the propriety of its decision to pursue termination in the first place. The following principles are applicable to this aspect of Father's position.

> Before filing a petition for termination of parental rights, the Commonwealth is required to make reasonable efforts to promote reunification of parent and child. However, the Commonwealth does not have an obligation to make such efforts indefinitely. The Commonwealth has an interest not only in family reunification but also in each child's right to a stable, safe, and healthy environment, and the two interests must both be considered. A parent's basic constitutional right to the custody and rearing of his or her child is converted, upon the parent's failure to fulfill his or her parental duties, to the child's right to

have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment. When reasonable efforts to reunite a foster child with his or her biological parents have failed, then the child welfare agency must work toward terminating parental rights and placing the child with adoptive parents. The process of reunification or adoption should be completed within eighteen (18) months. While this time frame may in some circumstances seem short, it is based on the policy that a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re Adoption of R.J.S.*, 901 A.2d 502, 507 (Pa.Super. 2006) (emphasis, citations, and internal quotation marks omitted) (footnote omitted).

In *In re D.C.D*., 91 A.3d 173 (Pa.Super. 2014), *appeal granted*, ___ A.3d ___, 2014 WL 2503618 (Pa. 2014), this Court found that an agency's utilization of reasonable efforts was a prerequisite to filing a petition to terminate parental rights. In that case, an orphans' court found that "the Agency has simply failed to assist Father," but it nevertheless terminated parental rights due to the father's parental incapacity. *Id*. at 177. Without addressing the father's parental incapacity, this Court concluded that reversal was warranted because the certified record supported the orphans' court's finding that the agency's pre-petition efforts were deficient. *Id*. at 174 ("the orphans' court erred as a matter of law by terminating Father's parental rights in spite of its finding that CYS failed to provide him with reasonable efforts to promote reunification prior to filing its termination petition"); *see also id*. at 182-183.

Instantly, however, any potential application of our holding in *In re D.C.D.* is dubious at best. Unlike the orphans' court in *In re D.C.D.*, the

trial court in the present case did not find that DHS's efforts were deficient. Thus, **In re D.C.D.** is facially inapplicable. What is more, even if we force a strained application of our holding in **In re D.C.D.** to the facts of this case, the record will not sustain the conclusion that DHS's efforts were wanting.

Preliminarily, we observe that Father's contentions relating to DHS's efforts relate primarily to the level of the agency's interactions with Paternal Grandfather. As those arguments do not challenge DHS's efforts to promote **Father's** reunification with S.E.J., they are unpersuasive. Simply stated, despite Father's preoccupation with the agency's consideration of Paternal Grandfather as a potential placement resource, the agency's alleged inaction in that regard is unrelated to its efforts to provide Father resources and services designed to effectuate his reunification with S.E.J. Thus, no relief is due.

Moreover, as it relates to the narrow aspect of Father's argument that actually challenges DHS's reunification efforts with respect to Father, those assertions also fail. Unlike an unacceptable scenario where a child service agency simply abandons a parent, DHS contacted Father at the outset of its involvement, considered him as a potential placement resource, at least prior to his incarceration, and maintained contact with him in prison throughout the proceedings. N.T., 1/8/14, at 16-17, 18, 21, 27-28. Father was informed of the FSP process and advised of the results of the FSP meetings. DHS Exhibits 4, 8, and 10. Moreover, the agency corresponded with Father in prison, developed goals that he could attain while

incarcerated, and offered visitation with S.E.J. N.T., 1/8/14, at 18, 27-28, 39, 48. These efforts were sufficient.

Finally, while Father faults DHS for not ascertaining his level of compliance with the FSP goals while incarcerated, the record belies this contention. First, Father must concede that his prison counselor failed to contact DHS despite two telephone messages to the counselor requesting that outreach. *Id*. at 47-48. We will not fault DHS for the prison counselor's failure to perform. Second, and more importantly, while Father reported that he completed a parenting class and drug treatment, he failed to provide DHS with any written documentation that he completed those programs. *Id*. at 39, 48, 51, 132-133. Thus, despite Father's protestations to the contrary, the certified record includes scant evidence to support his assertion that DHS abandoned him during the reunification process.

Next, we address Father's conventional challenges to the trial court's finding that DHS established the statutory grounds to terminate his parental rights, and for the following reasons, we find Father's arguments unpersuasive. Grounds for termination of a biological parent's parental rights are governed by 23 Pa.C.S. § 2511. Herein, the trial court found sufficient evidence to terminate Father's parental rights under § 2511(a)(1), (2), (5), (8) and (b), which provide in pertinent part as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

. . . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

. . . .

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing,

furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

"In termination cases, the burden is upon [the agency] to prove by clear and convincing evidence that its asserted grounds for seeking the termination of parental rights are valid." *In re R.N.J.*, *supra* at 276. Moreover, we have explained, "[t]he standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" *Id*. at 276 (quoting *In re J.L.C.,* 837 A.2d 1247, 1251 (Pa.Super. 2003)). The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004). "[I]f competent evidence supports the court's findings, we will affirm even if the record could also support the opposite result." *In re N.C.*, 763 A.2d 913, 917 (Pa.Super. 2000).

We need only agree with one subsection of 23 Pa.C.S. § 2511(a) and (b) in order to affirm the trial court's decision to terminate parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Herein, the trial court concluded that DHS satisfied the statutory grounds to terminate

- 10 -

Father's parental rights pursuant to 2511(a)(1) and (b). Thus, we will address those subsections.

The pertinent inquiry for our review follows:

To satisfy Section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. . . . Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.

*In re D.J.S.*, 737 A.2d 283, 285 (Pa.Super. 1999) (quoting *Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)) (internal citations omitted). Although it is the six months immediately preceding the filing of the petition that is the most critical to the analysis, the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. *In re B.,N.M.*, 856 A.2d 847 (Pa.Super. 2004).

In *In re C.M.S.*, 832 A.2d 457, 462 (Pa.Super. 2003), we explained, "A parent is required to exert a sincere and genuine effort to maintain a parent-child relationship; the parent must use all available resources to preserve the parental relationship and must exercise 'reasonable firmness' in resisting obstacles placed in the path of maintaining the parent-child

- 11 -

relationship." As it relates to incarcerated parents, our Supreme Court reiterated in *In re Adoption of S.P.*, 47 A.3d 817, 828 (Pa. 2012), that the primary focus of the § 2511(a)(1) analysis is whether an incarcerated parent exercised reasonable firmness in declining to yield to obstacles created by imprisonment and employed available resources to maintain a relationship with his or her child. The High Court explained, "pursuant to the abandonment analysis [an incarcerated parent has] a duty to utilize available resources to continue a relationship with his or her child." *Id*.

Instantly, the trial court found that Father failed to exercise reasonable firmness in attempting to overcome the obstacles presented by his incarceration. The trial court reasoned as follows:

> The Court's focus under 23 Pa.C.S.A. §2511(a)(1) is on whether or not Father utilized the resources available to him while he was incarcerated to further a relationship with his child. *In re Adoption of S.P*., 616 Pa. 309. 328. 47 A.3d 817 (2012). While Father asserts that he maintained a relationship with his child by calling during child's visits with paternal grandfather, there is no way to verify Father's assertions. There was no evidence presented that Father sent letters or gifts to the child, and he has not seen the child since July of 2011. Father did not maintain contact with his social workers, the two individuals in the best position to help him achieve his goals and to keep him appraised of S.E.J.'s welfare. Father himself stated, "I basically leave a lot of things in my Dad's hands because I was in jail and there wasn't really . . . much I could do." (N.T. 1/8/2014, p. 128, lines 120-16). Therefore, the Court found that Father had not utilized the resources available to him to the best of his ability.

Trial Court Opinion, 3/11/14, at 6-7.

The record supports the trial court's determination that Father did not utilize the agency's resources to the best of his ability. During the evidentiary hearing, Akilah Owens, the DHS caseworker assigned to the family testified that the agency initially desired to place S.E.J. and her half-sister with Father but his incarceration ultimately thwarted those efforts. N.T., 1/8/14, at 16-17. She stated that following his incarceration, Father contacted the agency on a couple of occasions during 2011 and 2012 to direct the agency to place S.E.J. with his parents. *Id*. at 18, 27-28. He also informed DHS of the programs available to him at the prison. *Id*. at 48. She further elucidated that Father left one telephone message with DHS, wherein he requested that DHS transport S.E.J. to the prison so that she could attend his planned graduation from a parenting class. *Id*. at 38. Ms. Owens explained that the request was not fulfilled, however, because Father had previously declined visitation with his daughter and the agency was unable to obtain reassurances from S.E.J.'s physician that she was medically able to visit the prison. *Id*. at 39.

Zakiah Snead, the JFCS foster care supervisor, also testified during the evidentiary hearings. She stated that her first contact with Father did not occur until December 2013, even though she mailed correspondence to his prison address during 2011 and 2012. *Id*. at 84. None of the correspondence was returned as undeliverable. *Id*. at 85, 97. Father's first contact with Ms. Snead related to his one request for visitation with S.E.J. in

conjunction with his expected graduation from the prison parenting program. *Id*. at 85-86. As noted, that visitation did not occur due to Father's initial rebuff of any visitation. *Id*. at 94. Ms. Snead explained that she could not collect the required authorizations and documentation within the brief period between Father's request and the scheduled graduation. *Id*. at 94-96. In addition to refusing visitation with S.E.J., Father failed to send Ms. Snead any correspondence about his case or give her letters to forward to S.E.J. at her foster home *Id*. at 86.

With regard to the lack of physical contact with S.E.J. since July 2011, Ms. Snead relayed that Father reportedly called Paternal Grandfather and Mother on their mobile phones during their respective visitations with S.E.J. *Id*. at 94. However, since Grandfather's visitations were unsupervised, Ms. Snead was unable to determine if those telephone conversations were appropriate. *Id*. at 97. Likewise, Ms. Snead testified that Mother attended only forty-five percent of her scheduled visitations with S.E.J., and on the few occasions that Mother did attend the supervised visitations, she was high on drugs sixty-five percent of the time. *Id*. at 79, 92-93. While the record supports that there was some telephone contact between Father and S.E.J. during her visits with Mother and Paternal Grandfather, the nature and frequency of these surreptitious conversations cannot be substantiated.

Rather, the certified record confirms that Father contacted DHS on a few occasions over the three-year period that S.E.J was in placement.

Those contacts included correspondence regarding the FSP and his goals under that plan. Father rebuffed the court-ordered visitation with his daughter at the prison, and he made a solitary telephone call to DHS. Moreover, he failed to contact the foster care social worker until 2013, and then he simply requested a special accommodation so that S.E.J. could attend his planned graduation from parenting class. He failed to give the foster care social worker any gifts, letters, or cards to forward to his daughter.

This case is not a scenario where an incarcerated parent cultivated a relationship with his daughter despite the obstacles of incarceration. Instead, throughout this case, including the six months that are most critical to the §2511(a)(1) analysis, Father was content to delegate his parental responsibilities to Paternal Grandfather.[2] Father did not correspond with DHS regularly or contact JFCS at all. He failed to contact his daughter through proper channels or send any cards or gifts to the agency or her foster home to celebrate birthdays and major holidays. At most, Father completed two prison programs, neither of which was documented by a

_____

[2] Father testified that he gave Paternal Grandfather items for S.E.J., including drawings, pictures, a children's book and a DVD recording of him reading the book. N.T., 1/8/14, at 128-130. The trial court considered Father's testimony and weighed it accordingly. Trial Court Opinion, 3/11/14, at 10-11. It is beyond our standard of review to question the trial court's determinations of weight and credibility. *See In re R.L.T.M.*, *supra* at 191-192. ("We are limited to determining whether the decision of the trial court is supported by competent evidence.").

certificate of completion, and he apparently spoke with his then-five-year-old daughter on a makeshift party line during her visitations with Paternal Grandfather and Mother. As noted, however, the frequency and nature of those contacts are unknown. In light of the foregoing evidence and our deferential standard of review, we accept the trial court's conclusion that Father failed to exercise reasonable firmness to overcome the obstacles presented by incarceration in attempting to establish a relationship with S.E.J.

Having concluded that the trial court did not err in finding that DHS satisfied its burden pursuant to 23 Pa.C.S. § 2511(a)(1), we next review the court's needs and welfare analysis under § 2511(b). While the Adoption Act does not mandate that the trial court consider the effect of permanently severing parental bonds, our case law requires it where a bond exists to some extent. **See In re E.M.**, 620 A.2d 481, 485 (Pa. 1993).

The extent of the trial court's bond-effect analysis depends upon the circumstances of a particular case. **In re K.Z.S.**, 946 A.2d 753, 763 (Pa.Super. 2008). We have emphasized that while a parent's emotional bond with his child is a major aspect of the § 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the trial court when determining what is in the best interest of the child. **In re K.K.R.-S.**, 958 A.2d 529, 535-536 (Pa.Super. 2008). Indeed, the mere existence of an emotional bond does not preclude the termination of parental rights. **See In**

*re T.D.*, 949 A.2d 910 (Pa.Super. 2008) (trial court's decision to terminate parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child).

As we explained in *In re K.Z.S.*, *supra* at 763 (emphasis omitted),

> In addition to a bond examination, the court may equally emphasize the safety needs of the child under subsection (b), particularly in cases involving physical or sexual abuse, severe child neglect or abandonment, or children with special needs. The trial court should also examine the intangibles such as the love, comfort, security and stability the child might have with the foster parent. Another consideration is the importance of continuity of relationships to the child and whether the parent child bond, if it exists, can be severed without detrimental effects on the child. All of these factors can contribute to the inquiry about the needs and welfare of the child.

*See also In re A.S.*, 11 A.3d 473, 483 (Pa.Super. 2010) (orphans' court can emphasize safety needs, consider intangibles, such as love, comfort, security, and stability child might have with the foster parent, and importance of continuity of existing relationships).

Instantly, the trial court concluded that severing the parental bond and freeing S.E.J. for adoption was in the child's best interest. *See* Trial Court Opinion, 3/11/14, at 8, 11-12. Relying upon testimony proffered by Ms. Owen and Ms. Snead during the hearing, the trial court found that S.E.J. shared a meager bond with Father that was based upon their limited telephone contact. *Id*. at 8-11. The court continued that the meaningful parent-child relationships in this case were between S.E.J. and her pre-adoptive foster parents, who satisfied her developmental, physical, and

- 17 -

emotional needs. *Id*. at 9-11. After reviewing the pertinent testimony, the trial court reasoned,

> While there was some evidence presented that Father has had phone contact with S.E.J. while incarcerated, the Court found it to be insufficient to create a parent/child bond. When asked about his efforts to maintain contact with his daughter while incarcerated, Father testified, "I basically leave a lot of things in my Dad's hands because I was in jail and there wasn't really wasn't much I could do." (N.T. 1/8/2014, p. 128. lines 12-16). Father testified that he recently sent a book and a DVD showing him reading the book to his daughter. (N.T. 1/8/2014, p. 129, lines 3-16).
>
> Despite some efforts by Father to maintain contact with his child, the evidence established that S.E.J. was well-cared for and bonded to her foster family. As the agency social worker testified, the foster parents are the only family the child knows.
>
> The Court concluded that S.E.J. would not suffer irreparable harm if Father's rights were involuntarily terminated, that she would suffer harm were she to be removed from her foster family, and adoption would be in the best interest of the child.

*Id*. at 10-11.

Our review of the certified record confirms the trial court's conclusion. Ms. Owens testified that S.E.J. was approximately two years old when the child was removed from Mother and that Father did not have any contact with his daughter since that date other than intermittent telephone contact. N.T., 1/8/14, at 41-42. Ms. Owens also indicated that she observed S.E.J. interact with her foster parents, whom she refers to as "Mom and Dad," on approximately twenty-four occasions. *Id*. at 40. She characterized the foster home as loving, nurturing, and structured, and opined that

terminating Father's parental rights in anticipation of adoption would not have a negative effect on the child. *Id*. 40-42.

Similarly, Ms. Snead testified that there would be no negative effects upon S.E.J. if the parental rights of Father were terminated, *id*. at 89, and opined that adoption was the proper goal for the child. *Id*. at 90. In contrast to the paltry connection S.E.J. has with Father, Ms. Snead stated that the foster parents care for S.E.J. as their own and she described their relationship as follows.

> [She is] very bonded to [her] foster family, call[s] them Mom and Dad. [She] ha[s] been there . . . since she was in Pampers and she is now walking around. That is all she knows, the foster parents. . . . [She] turn[s] to them for nurture, [lies] on their shoulder, cry, help, that is who [she] turn[s] to. They are very bonded.

*Id*. at 88-89.

Mindful of the additional factors that we stressed should be emphasized during the needs-and-welfare analysis in *In re K.Z.S.*, *supra* at 763, such as "the love, comfort, security and stability the child might have with the foster parent" and the importance of continuing those beneficial relationships, we find that the record confirms that terminating Father's parental rights best satisfies S.E.J.'s developmental, physical, and emotional needs and welfare.[3]

---

[3] In addition to the testimony cited by the trial court, we observe that it is not only relevant to S.E.J.'s emotional needs and welfare, but also highly
*(Footnote Continued Next Page)*

For all of the foregoing reasons, affirm the trial court order terminating Father's parental rights to S.E.J. pursuant to § 2511(a)(1) and (b).

Order affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/13/2014

---

*(Footnote Continued)* ───────

beneficial that she and her older half-sister share the same pre-adoptive foster home.