J-S07032-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| IN RE: L.A.M., III, A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: L.M., FATHER | : | No. 154 EDA 2023 |

Appeal from the Decree Entered December 19, 2022
In the Court of Common Pleas of Carbon County
Orphans' Court at No(s): 22-9060

| IN RE: S.M.M., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: L.M., FATHER | : | No. 155 EDA 2023 |

Appeal from the Decree Entered December 19, 2022
In the Court of Common Pleas of Carbon County
Orphans' Court at No(s): 22-9061

BEFORE: DUBOW, J., KUNSELMAN, J., and KING, J.

MEMORANDUM BY KING, J.: **FILED AUGUST 1, 2023**

Appellant, L.M. ("Father"), appeals from the decrees entered in the Carbon County Court of Common Pleas, Orphans' Court, granting the petition of Carbon County Office of Children and Youth Services ("CYS") for involuntary termination of Father's parental rights to his minor children, daughter S.M.M. (age 12) and son L.A.M. (age 8) ("Children"). We affirm.

The relevant facts and procedural history of this case are as follows. Father and T.S. ("Mother") are the parents of Children. CYS became involved with the family in January 2019, due to Mother's substance abuse and mental health issues, and resultant inability to care for Children. Father was incarcerated at the time. S.M.M. was placed in a foster home in March 2019 and has remained there since then. L.A.M. was placed with Father's mother, M.H. ("Paternal Grandmother"), in March 2019. In June 2021, L.A.M.'s placement was changed to the foster home where S.M.M. resided due to concerns over L.A.M.'s extensive truancy and behavioral issues. L.A.M. has remained at the foster home since his placement. On January 31, 2022, CYS filed a petition for the termination of parental rights.

At the termination hearings, the Orphans' court heard testimony from Peter Nyamari, a caseworker at CYS. Mr. Nyamari testified that since Children have been in placement, Father has had limited involvement in Children's lives and taken minimal to no steps to remedy the conditions which led to Children's placement. When CYS learned that Father was no longer incarcerated in 2020, CYS attempted to get Father to work with Justice Works to help him find housing and employment. Although Father initially established contact with Justice Works, he stopped responding and Justice Works closed Father's case without progress. Father was incarcerated again later that year and did not have contact with Children when he was in prison. In September 2021, Father contacted CYS while he was in a rehabilitation facility. S.M.M. was unwilling

to talk or meet with Father at this time. CYS set up a phone call between Father and L.A.M. and attempted to set up an in-person visit. Before the visit could occur, however, Father absconded from the rehab facility without authorization. Father did not initiate contact with CYS again and CYS was unaware of Father's whereabouts for a period of time.

Mr. Nyamari testified that in March 2022, CYS learned that Father was incarcerated again. When Mr. Nyamari went to visit Father in prison regarding the proceedings in this case, Father requested to see L.A.M. Mr. Nyamari brought L.A.M. to visit Father in prison and they had a fifteen-minute conversation. L.A.M. requested more time to speak with Father but that was not possible to do on that date. S.M.M. again refused to see or speak to Father and no other further visits occurred between Father and L.A.M.

Mr. Nyamari reported that he visits Children at least once a month and they are both doing well in their foster home. Children are well bonded with their foster parents and all their physical, emotional, and educational needs are being met. Both Children were behind in school when they were initially placed but are doing significantly better now. All of Children's physical and mental health concerns are being addressed. L.A.M. recently underwent a successful surgery to clip his frenulum, the connecting skin under his tongue, to correct lingering issues with his speech. Although L.A.M. is strongly bonded with Paternal Grandmother, both Children are happy and healthy in their foster home.

Dr. John P. Seasock testified that he performed a psychological evaluation and bonding assessment of Children. After speaking with each child, Dr. Seasock opined that neither child has a parental bond with Father. S.M.M. has not had any contact with Father in 30 months and has no interest in having any contact with Father. She is closely bonded with her foster parents and becomes very distressed at the thought of being removed from her foster home. S.M.M. stated that she would commit suicide if she had to go live with her mom again. Upon further inquiry, Dr. Seasock does not believe S.M.M. is suicidal but her statement is a trauma response to reengagement with Mother. When Dr. Seasock asked L.A.M. about Father, the only thing L.A.M. could state about Father was that he was in prison and had a beard. When pressed further, L.A.M. stated that he could not recall any memories or past interactions he had with Father. Based on this response, Dr. Seasock concluded that there were no signs of attachment between L.A.M. and Father. Dr. Seasock testified that L.A.M. has a significant attachment to Paternal Grandmother and initially had difficulty transitioning into his foster home. However, L.A.M. now reports that his grandmother could not take care of him anymore and it is good that he is at the foster home.

Dr. Seasock also testified that Children have a significant attachment to foster parents and identify them as mom and dad. Both Children have a typical parent-child relationship with foster parents and are well adjusted in their foster home. Both Children are actively engaged in family activities and

have formed bonds with the foster parents' extended family. They are both doing well in school and are up to date on their medical appointments. Dr. Seasock reported that Children are happy, healthy and thriving in their current placement.

S.M.M., who was twelve years old at the time of the hearing, testified that she has not seen Father in a long time. She expressed strong negative feelings toward Father, noting that he promised her a lot of things and broke her trust. S.M.M. testified that she likes to think of her foster parents as her mom and dad and expressed a clear wish to continue to stay with her foster parents. She is very happy at her foster home and all her needs are met by her foster parents.

L.A.M., who was eight years old at the time of the hearing, initially stated that he did not remember anything about Father. When questioned more specifically, L.A.M. confirmed that he remembered spending time with Father a few times when he was not in prison. Specifically, he remembered going to the gym and going fishing with Father. L.A.M. testified that he refers to his foster mother as "mom" or by her first name and refers to foster father by his first name. He reported that his foster parents take care of him, and he likes living with them. L.A.M. also stated that he liked living with Paternal Grandmother and did not express a preference on where he would rather live. L.A.M. noted that he goes to school more consistently and eats healthier at his foster home.

Father testified that he was released from jail for a time in 2020 and he saw L.A.M. at least once a week when L.A.M. was in Paternal Grandmother's care. Father would take L.A.M. fishing, to the playground, and play football with him. Father stated that he has a good relationship with L.A.M. and always tried to be good father to Children when he was not incarcerated. Father was reincarcerated later in the year in 2020. Father reports that while he was incarcerated, he wrote letters to Children's foster mother inquiring about Children, and they corresponded many times about Children's activities. Father stated that despite his repeated requests to set up visits or phone calls with Children while he was incarcerated, CYS never arranged the visits, resulting in S.M.M. forgetting him.

Father was released from prison again in 2021, and he began seeing L.A.M. while he was in Paternal Grandmother's care. Father testified that the last time he saw L.A.M. was in May 2021, and he did not attempt to contact Children from July 2021 to March 2022 because he was "on the run." Father was incarcerated again in March 2022. At the time of the hearing, Father was still incarcerated and had pending criminal charges in Carbon County, for which he could be sentenced to three to seven years' incarceration if convicted.

On December 16, 2020, the Orphans' court entered decrees

involuntarily terminating Father's parental rights to Children.[1] On January 6, 2023, Father timely filed separate notices of appeal and concise statements of errors complained of on appeal for each underlying court docket number. This Court consolidated the appeals *sua sponte* on January 25, 2023.

Father raises the following issues for our review:

> Whether the [Orphans' court] erred in finding that [CYS] had established, by the heightened clear and convincing evidentiary standard, valid grounds for terminating Father's parental rights to [L.A.M.] when Father maintained contact with the minor while incarcerated and maintained contact with the minor when the minor previously resided with his Paternal Grandmother.
>
> Whether the [Orphans' court] erred in finding that [CYS] had established, by the heightened clear and convincing evidentiary standard, valid grounds for terminating Father's parental rights to S.M.M. when Father made attempts to contact his children and wrote both Children letters to the foster family when he was incarcerated.

(Father's Brief at 3).

In his issues combined, Father asserts that he attempted to maintain contact with Children while he was incarcerated by writing letters to Children's foster mother on a regular basis. Father states that when he was on parole, he regularly saw L.A.M. and has a good relationship with him. Father further emphasizes that L.A.M.'s recent visit with Father at the prison went well and L.A.M. requested more time to spend with Father. Father argues that he consistently made attempts to maintain contact with Children even with the

_____

[1] The court also terminated Mother's parental rights to Children, finding that Mother failed to make sufficient progress in improving the circumstances that led to Children's placement.

limitations he faced by being incarcerated during the COVID-19 pandemic. Father contends that he has always tried to maintain a relationship with Children when he was not imprisoned, except for the limited time when there was a warrant out for Father. Father concludes that the court erred in finding that CYS presented clear and convincing evidence that Father's parental rights to Children should be terminated, and this Court should vacate the termination decrees. We disagree.

Appellate review in termination of parental rights cases implicates the following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

*In re Z.P.*, 994 A.2d 1108, 1115 (Pa.Super. 2010) (quoting *In re I.J.*, 972 A.2d 5, 8 (Pa.Super. 2009)).

> > Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. … We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.
> >
> > *In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).
> >
> > Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by

> clear and convincing evidence the existence of grounds for doing so.
>
> > *In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa.Super. 2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *In re J.D.W.M.*, 810 A.2d 688, 690 (Pa.Super. 2002). We may uphold a termination decision if any proper basis exists for the result reached. *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. *In re R.L.T.M.*, 860 A.2d 190, 191[-92] (Pa.Super. 2004).

*In re Z.P., supra* at 1115-16 (quoting *In re Adoption of K.J.*, 936 A.2d 1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008)).

CYS filed a petition for the involuntary termination of Father's parental rights on the following grounds:

> **§ 2511. Grounds for involuntary termination**
>
> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> > \* \* \*
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the

- 9 -

developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

"A court may terminate parental rights under subsection 2511(a)(1) when the parent demonstrates a settled purpose to relinquish parental claim to a child or fails to perform parental duties for at least six months prior to the filing of the termination petition." *In re I.J., supra* at 10. This Court has said:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.
>
> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his… ability, even in difficult circumstances. A

- 10 -

parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his… physical and emotional needs.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005) (internal citations omitted).

"Each case of an incarcerated parent facing termination must be analyzed on its own facts, keeping in mind … that the child's need for consistent parental care and stability cannot be put aside or put on hold[.]" *Interest of K.M.W.*, 238 A.3d 465, 474 (Pa.Super. 2020) (*en banc*) (quoting *In re E.A.P.*, 944 A.2d 79, 82-83 (Pa.Super. 2008)). "The focus is on whether the parent utilized resources available while in prison to maintain a relationship with his or her child. An incarcerated parent is expected to utilize all available resources to foster a continuing close relationship with his or her children." *In re B., N.M., supra* at 855 (internal citations omitted). "Importantly, a parent's 'recent efforts to straighten out [his] life' upon release from incarceration does not require that a court 'indefinitely postpone adoption.'" *Interest of K.M.W., supra* at 474 (quoting *In re Z.P., supra* at 1125).

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3)

consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008) (internal citations omitted). Regarding the six-month period prior to filing the termination petition:

> [T]he trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B., N.M., supra* at 855 (internal citations omitted).

"Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." *In re Z.P., supra* at 1117.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (internal citations omitted).

Under Section 2511(b), the court must consider whether termination will meet the child's needs and welfare. *In re C.P.*, 901 A.2d 516, 520 (Pa.Super. 2006). In doing so, the court must analyze the following four

factors: (1) whether the parental bond is necessary and beneficial to the child; (2) the child's need for permanency and length of time in foster care; (3) whether the child is in a pre-adoptive home and bonded with foster parents; and (4) whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety and stability. **Interest of K.T.**, ___ Pa. ___, ___ A.3d ___, 2023 WL 4092986 (Pa. filed June 21, 2023). "The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." **In re C.P., supra** (internal citations omitted). "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." **In re Z.P., supra** at 1121.

Instantly, the Orphans' court determined that CYS presented ample evidence to demonstrate that Father failed to perform parental duties for Children for longer than the six months required by Section 2511(a)(1). Specifically, there is no evidence that Father had any communication or interaction with S.M.M. since her initial placement in 2019. Father also had only minimal contact with L.A.M. during this time. Although Father was incarcerated for much of this time, the evidence does not demonstrate a serious effort by Father to maintain his relationship with Children during his incarceration. **See In re B., N.M., supra**. Father did not have phone conversations or visits with Children while incarcerated, except for one fifteen-

minute visit with L.A.M. after CYS had already filed the termination petition. Even while L.A.M. was in Paternal Grandmother's care, there is no evidence that Father maintained contact with L.A.M. while Father was incarcerated. Father maintains that he wrote letters to Children's foster mother to stay updated on Children's wellbeing. However, the Orphans' court noted that Father failed to file any petitions in this matter, take significant steps to communicate with Children directly, send money or gifts for Children's care, inquire about Children's medical or educational needs, or avail himself of any parental programs while incarcerated.

Additionally, when Father was on parole, Father failed to take significant steps to have a relationship with Children. Mr. Nyamari testified that Father did not cooperate with Justice Works to help him find suitable employment and housing. There is no evidence that Father took any measures to attempt to repair his relationship with S.M.M. and reengage communication with her. Father also failed to participate in caring for L.A.M.'s physical, emotional, medical, or educational needs during this time period. Further, Father admitted that he chose to be "on the run" rather than have any contact with Children from July 2021 to March 2022, at which point Father was reincarcerated. Based on the forgoing, we agree with the Orphans' court that CYS presented sufficient evidence of Father's failure to perform parental duties for Children to warrant termination under Section 2511(a)(1). *See **In re Z.P.**, supra*.

Regarding Section 2511(b), the Orphans' court found that neither child has a parental bond with Father. S.M.M. testified that she has not had any contact with Father in a long time. She also expressed strong negative feelings towards Father and stated that she did not want to have a relationship with him. Further, Dr. Seasock testified that he did not discern a parental bond between Father and L.A.M. because L.A.M. could not tell him anything about Father other than that Father was in prison and had a beard. This assessment was corroborated by L.A.M.'s testimony, where L.A.M. initially had nothing to say when asked about Father and only recounted a few instances of going to the gym and going fishing with Father when asked more specific questions.

Additionally, Mr. Nyamari's testimony, Dr. Seasock's testimony, and Children's own testimony makes clear that Children have a significant parental bond with their foster parents. Children view their foster parents as their parents and turn to them for their daily needs. The foster parents provide for Children's physical, emotional, and educational needs, ensuring that they are doing well in school, up to date on all their medical appointments, and providing a happy, healthy, and stable environment for Children. Children are also engaged in family activities with their foster family and have formed bonds with their foster parents' extended family. Dr. Seasock opined that there would be no adverse consequences in terminating Father's parental rights to Children because Children do not have a relationship with Father and

have a strong emotional attachment to their foster parents. Therefore, we discern no abuse of discretion in the court's determination that termination of Father's parental rights would best serve Children's needs and welfare pursuant to Section 2511(b). **See *Interest of K.T.*; *In re Z.P., supra*.** Accordingly, we affirm the decrees involuntarily terminating Father's parental rights to Children.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/1/2023