J-A11020-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: J.S., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: M.S., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1817 MDA 2024 |

Appeal from the Decree Entered December 9, 2024
In the Court of Common Pleas of Cumberland County Orphans' Court at
No(s):  017-ADOPT-2024

BEFORE:   MURRAY, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY KING, J.:                                        **FILED: MAY 29, 2025**

Appellant, M.S. ("Father"), appeals from the decree entered in the Cumberland County Court of Common Pleas, Orphans' Court, which granted the petition of the Cumberland County Children and Youth Services ("CYS"), for involuntary termination of Father's parental rights to his minor child, J.S. ("Child") (born in May 2022).[1]  We affirm and grant counsel's petition to withdraw.

The Orphans' Court set forth the relevant facts and procedural history of this matter as follows:

> [CYS] became involved with [Child] in November 2022 following a referral reporting [Mother] was in the emergency room threatening to commit suicide and had been engaging

---

[*] Former Justice specially assigned to the Superior Court.

[1] D.H. ("Mother") voluntarily relinquished her parental rights to J.S.  (**See** N.T. Hearing, 11/23/24, at 9-10).  Mother is not a party to this appeal.

in self-harm at home with [Child] present.[FN4] Another referral came the same month reporting that [Mother] was not supervising [Child] and that her live-in boyfriend was a Megan's Law offender. [CYS] put parenting services in place for [Mother,] which were in part to address unclean living conditions in the home and an infestation of cockroaches. [Father] was not romantically involved with [Mother] or living with her or [Child] at the time. [Mother] refused to provide information about the father of [Child] to [CYS] due to a history of domestic violence with [Father]. [CYS] ultimately located [Father] in March of 2023 when a [CYS] caseworker went to [Mother's] home and found [Father] alone there with [Child]. In April 2023, [CYS] made additional contact with [Father] by phone, at which time [Father] expressed gratitude that [CYS] reached out to him because he wanted contact with [Child] but [Mother] was not permitting it.

> [FN4] At that time, [Mother] also had custody of her older child, a half-sister to the child at issue in this appeal. The older child now lives primarily with her father and [Mother] has weekly supervised visits.

[Child] was removed from [Mother's] care on May 1, 2023[2] for continued home sanitation issues and placed in the home of his maternal aunt, where he has since remained. Removal was unopposed by either parent. [Father] was not a resource at the time due to unmet objectives in his permanency plan and instability in housing; he was living with several family members and planning to move to Scranton, which ultimately did not occur. [Mother] moved in with [Father] and his family members in July 2024, which is her fifteenth home since June 2023. For contextual purposes, [the court notes] that [Mother's] reunification goals included engaging in domestic violence services (related to fighting with [Father] and physical violence in her relationship with another person she was involved with when [CYS] was initially involved), maintaining stable employment, and completing parenting services, which were unmet at the time of the termination hearing. [Mother] was also pregnant with a child belonging to

_____

[2] The court adjudicated Child dependent on June 1, 2023.

[Father] at the time of the hearing and she ultimately consented to termination of her parental rights to the child at issue in this appeal.

To [Father]'s credit, he completed his permanency plan and reunification goal of obtaining a drug and alcohol evaluation in February 2024, which recommended no services as he was no longer drinking alcohol, which he had indicated to [CYS] that he felt caused the bulk of his fighting with [Mother] in the past. He did not often attend medical appointments for [Child], but his supervised visits with [Child] were going well when he attended. That said, [Father] was offered 31 visits with [Child], attended 19, and no-showed at six visits between March and October 2024, which is part of a larger history of no-showing at visits with the child, for example, attending no visits between June and October of 2023. From October through the end of November of 2023, [Father] attended one out of five visits offered. In June 2024, [Father] reported that he "ha[d] a system where he wouldn't oversleep anymore," though, again, he no-showed six times between March and October 2024. [Father's] parenting assessment recommended a mental health evaluation, which he never obtained, as well as domestic violence classes, from which he was unsuccessfully discharged in August 2024 for no-showing at sessions. [CYS] provided [Father] with a list of other domestic violence service providers, particularly ones local to him in York, though he never contacted any. The parenting assessment also recommended a basic parenting skills program to address supervision and safety skills, from which he was twice unsuccessfully discharged in December 2023 and approximately August 2024 for repeated no-shows. The parenting educator explained her understanding that [Father] had a transportation issue, though [Father] recognized at the hearing that he could get a driver's license if he wished, and would have access to a vehicle to drive (and own) if he did so, but he had not.

[Child] had surgery related to a kidney issue in November 2023; [Mother] visited [Child] for a few minutes and left and [Father] did not visit at all, though the foster mother ([Child's] maternal aunt) contacted him. [Father] does not contact [Child's] foster mother for updates on how [Child] is doing in speech therapy or otherwise, though the foster

mother said she has repeatedly voiced at every proceeding that he could text her any time, day or night. [Father] testified that he tries his best to get to visits, but he doesn't always have someone to take him, though he recognized … that nothing is preventing him from obtaining a driver's license and vehicle. As to why he had not completed a mental health evaluation (or followed any recommended treatment), he said he had to pay too much money to start classes, but he had recently located a provider for which his insurance will pay and he had an upcoming appointment soon. He also said that he hadn't been in contact with the foster mother because he had "a lot of stuff going on," which was his "fault," and that if he had three to five more months, he could complete the mental health and parenting programs. [The court] had to bifurcate the October 23, 2024 hearing and continue [it to] November 22, 2024, at which time [Father] testified that he would start "a mental health class" and parenting classes in December and was still looking for domestic violence classes.

The guardian *ad litem* and the attorney for [Child] advocated for termination of parental rights, pointing to the strong and loving bond [Child] has with his kinship foster and extended family living in the home, where he has spent most of his life. [Child's] aunt said [Child] very much enjoys waking up her husband's brother in the mornings to watch cartoons, watching football on Sundays with his "Pap," and having his "Grammy" make him breakfast in the morning, all of whom, including his foster mother and father, he loves very much.

(Orphans' Court Opinion, 1/16/25, at 1-5) (internal citations to the record and some footnotes omitted).

On May 12, 2024, CYS filed a petition seeking involuntary termination of Father's parental rights to Child. The court held termination hearings on October 23, 2024 and November 23, 2024. On December 9, 2024, the court entered a decree terminating Father's parental rights to Child pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (a)(8), and (b). On December 16, 2024, Father filed

a timely notice of appeal and contemporaneous statement of errors complained of on appeal. On February 11, 2025, Father's counsel filed an **Anders**[3] brief and application to withdraw in this Court.

As a preliminary matter, counsel seeks to withdraw his representation pursuant to **Anders** and **Commonwealth v. Santiago**, 602 Pa. 159, 978 A.2d 349 (2009). **Anders** and **Santiago** require counsel to: (1) petition the Court for leave to withdraw, certifying that after a thorough review of the record, counsel has concluded the issues to be raised are wholly frivolous; (2) file a brief referring to anything in the record that might arguably support the appeal; and (3) furnish a copy of the brief to the appellant and advise him of his right to obtain new counsel or file a *pro se* brief to raise any additional points the appellant deems worthy of review. **Santiago, supra** at 173-79, 978 A.2d at 358-61. Substantial compliance with these requirements is sufficient. **Commonwealth v. Wrecks**, 934 A.2d 1287, 1290 (Pa.Super. 2007). After establishing that counsel has met the antecedent requirements to withdraw, this Court makes an independent review of the record to confirm that the appeal is wholly frivolous. **Commonwealth v. Palm**, 903 A.2d 1244, 1246 (Pa.Super. 2006). **See also Commonwealth v. Dempster**, 187 A.3d 266 (Pa.Super. 2018) (*en banc*).

In **Santiago, supra**, our Supreme Court addressed the briefing requirements where court-appointed appellate counsel seeks to withdraw

---

[3] **Anders v. California**, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967).

representation:

> Neither **Anders** nor [**Commonwealth v. McClendon**, 495
> Pa. 467, 434 A.2d 1185 (1981)] requires that counsel's brief
> provide an argument of any sort, let alone the type of
> argument that counsel develops in a merits brief. To repeat,
> what the brief must provide under **Anders** are references
> to anything in the record that might arguably support the
> appeal.
>
> *     *     *
>
> Under **Anders**, the right to counsel is vindicated by
> counsel's examination and assessment of the record and
> counsel's references to anything in the record that arguably
> supports the appeal.

**Santiago, supra** at 176, 177, 978 A.2d at 359, 360. Thus, the Court held:

> [I]n the **Anders** brief that accompanies court-appointed
> counsel's petition to withdraw, counsel must: (1) provide a
> summary of the procedural history and facts, with citations
> to the record; (2) refer to anything in the record that
> counsel believes arguably supports the appeal; (3) set forth
> counsel's conclusion that the appeal is frivolous; and (4)
> state counsel's reasons for concluding that the appeal is
> frivolous. Counsel should articulate the relevant facts of
> record, controlling case law, and/or statutes on point that
> have led to the conclusion that the appeal is frivolous.

**Id.** at 178-79, 978 A.2d at 361. **See also In re J.D.H.**, 171 A.3d 903, 905-

06 (Pa.Super. 2017) and **In re V.E.**, 611 A.2d 1267, 1275 (Pa.Super. 1992)

(explaining that **Anders** procedure applies in appeals from termination of

parental rights and goal change orders).

Instantly, Father's counsel filed a petition to withdraw and an **Anders**

brief. Counsel claims to have conducted a review of the record and

determined the appeal is wholly frivolous. Counsel supplied Father with a

copy of the brief and a letter explaining Father's rights to retain new counsel or to proceed *pro se*.[4]  In the brief, counsel provides a summary of the facts and procedural history of the case.  Counsel's argument refers to relevant law that might arguably support Father's issues.  Counsel further states the reasons for his conclusion that the appeal is wholly frivolous.  Thus, counsel has substantially complied with the requirements of **Anders** and **Santiago**. **See Wrecks, supra**.

Counsel raises the following issues on Father's behalf:

> 1. Whether the [Orphans'] Court abused its discretion and committed an error of law when it found that sufficient grounds existed for a termination of Father's parental rights to his child, despite a lack of clear and convincing evidence, thus contravening section 2511(a) of the Adoption Act, 23 Pa.C.S.A. § 2511(a).
>
> 2 Whether the [Orphans'] Court abused its discretion and committed an error of law in terminating Father's parental rights when the conditions which led to the removal or placement of the child no longer existed or were substantially eliminated, thus contravening sections 2511(a) and (b) of the Adoption Act, 23 Pa.C.S.A. § 2511(a), (b).
>
> 3 Whether the [Orphans'] Court abused its discretion and committed an error of law in determining it would be in the child's best interest to have parental rights terminated, when Father, if given sufficient time, would be ready, willing, and able to parent the child and provide for his needs, thus contravening Section 2511(b) of the Adoption Act, 23 Pa.C.S.A § 2511(b).

(**Anders** Brief at 4-5).

_____

[4] Father has not filed a response either *pro se* or with newly-retained counsel.

- 7 -

In his issues combined, Father argues that the Orphans' Court failed to give proper weight to evidence that Father had met some of his permanency plan goals and objectives, and that he was committed to addressing the remaining goals if given additional time. According to Father, he had been making progress and remedying some of the circumstances leading to the removal and placement of Child, and he had not evidenced a settled purpose of relinquishing his claim to Child, or failed to perform parental duties.[5] Father further insists that the court's findings regarding the best interests of Child were inadequate and did not address the effect terminating Father's rights would have on Child, or consider that Father is limited in his ability to meet his goals. Father also claims the court properly failed to consider whether there was a bond between Child and Father and the effect of severing that bond. Father concludes that the Orphans' Court erred in terminating his parental rights, and this Court must grant relief. We disagree.

Appellate review in termination of parental rights cases implicates the following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

---

[5] Father makes other complaints concerning the court's findings relative to Section 2511(a)(8). Nevertheless, "we need only agree with [the Orphans' Court's] decision as to any one subsection in order to affirm the termination of parental rights." *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).

***In re Z.P.***, 994 A.2d 1108, 1115 (Pa.Super. 2010) (quoting ***In re I.J.***, 972

A.2d 5, 8 (Pa.Super. 2009)).

> Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. … We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

> ***In re B.L.W.,*** [***supra*** at 383].

> Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.

> ***In re Adoption of A.C.H.***, 803 A.2d 224, 228 (Pa.Super. 2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. ***In re J.D.W.M.***, 810 A.2d 688, 690 (Pa.Super. 2002). We may uphold a termination decision if any proper basis exists for the result reached. ***In re C.S.***, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. ***In re R.L.T.M.***, 860 A.2d 190, 191[-92] (Pa.Super. 2004).

***In re Z.P., supra*** at 1115-16 (quoting ***In re Adoption of K.J.***, 936 A.2d

1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165

(2008)).

CYS filed petitions for the involuntary termination of Father's parental

rights to Child on the following grounds:

### § 2511.  Grounds for involuntary termination

**(a)    General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*    \*    \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\*    \*    \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the

needs and welfare of the child.

\* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b).[6] "Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." **In re Z.P., supra** at 1117. When conducting a termination analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of…[his] parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

**In re L.M.**, 923 A.2d 505, 511 (Pa.Super. 2007) (internal citations omitted).

A court may terminate parental rights under Section 2511(a)(1) where the parent demonstrates a settled

_____

[6] The court limited its analysis to Sections 2511(a)(1) and (a)(8), "both of which [it] found satisfied," as well as Section 2511(b). (Orphans' Court Opinion at 6).

- 11 -

purpose to relinquish parental claim to a child or fails to perform parental duties for at least the six months prior to the filing of the termination petition. The court should consider the entire background of the case and not simply … mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his ... parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re Z.P.*, at 1117 (internal citations and quotations omitted). Further:

"Parental duties" are not defined in the Adoption Act, but our courts long have interpreted parental duties in relation to the needs of a child[,] such as love, protection, guidance and support. Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship. The roster of such positive actions undoubtedly includes communication and association. The performance of parental duties requires that a parent exert himself to take and maintain a place of importance in the child's life. Fortitude is required, as a parent must act with "reasonable firmness" to overcome obstacles that stand in the way of preserving a parent-child relationship and may not wait for a more suitable time to perform parental responsibilities.

*In re Adoption of L.A.K.*, ___ Pa. ___, ___, 265 A.3d 580, 592 (2021)

(internal citation and quotations omitted).

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for [his] conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008) (internal citations

omitted).

Under Section 2511(b), the court must consider whether termination will meet the child's needs and welfare. *In re C.P.*, 901 A.2d 516, 520 (Pa.Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *Id.* Significantly:

> In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship.
>
> When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation.

*In re Z.P., supra* at 1121 (internal citations omitted).

Further, our Supreme Court has recently clarified that, in making a Section 2511(b) determination, a trial court must analyze: (1) whether the parental bond is "necessary and beneficial to the child;" (2) "the child's need for permanency and length of time in foster care;" (3) "whether the child is in a pre-adoptive home and bonded with foster parents;" and (4) "whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety and stability." *Interest of K.T.*, ____ Pa. ____, ____, 296 A.3d 1085, 1113 (2023). Moreover, the Court explained that, when reviewing the nature of the parental bond, a

- 13 -

court must consider "whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *Id.* Importantly, the *K.T.* Court's decision is particularly relevant to an analysis of an existing parental bond. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

Instantly, the Orphans' Court observed, with respect to Section 2511(a)(1):

> This is not a case where [Father] did nothing in pursuit of reunification, but he did, frankly, very little, and certainly significantly less than what [the court] would term performing parental duties. In the six months preceding the filing of the petition for termination, [Father] had been discharged from the parenting skills program for repeated no-shows, was subject to a call-ahead requirement in order to attend visits with the child because of inconsistent appearances at visits and was being required to visit with the child at [CYS'] office rather than at the parenting program site for the same reason, had yet to obtain a mental health evaluation, participate in domestic violence programming, or do, bluntly, anything except sporadically attend visits with the child and obtain the drug and alcohol evaluation. Though beside the point for purposes of Section 2511(a)(1), [the court notes] that these facts remained true up to and including the date of the termination hearing. [The court] could not say with any sincerity that [Father] had exerted himself to take up a place of importance in the child's life or do anything more than visit enough to allow the child to recognize [Father].
>
> [The court notes,] significantly, that competent evidence established that [Father] was **always** capable of meeting

- 14 -

his reunification goals, which makes his lack of stewardship in parenting all the more tragic. [The court] heard [Father's] testimony that the mental health classes were expensive, an issue to which [the court is] sympathetic, but we also heard [Father's] testimony that he was somehow able to secure an appointment for an evaluation that his health insurance would cover at the eleventh hour, long after the termination petition was filed. [The court] also heard evidence that [Father] could not complete his parenting classes or consistently attend visits because he lacked transportation, but [the court] also heard his testimony that he **could** obtain a driver's license and had a vehicle ready and waiting for him in the event he did obtain a license, in addition to the caseworker's testimony that [Father] had reported oversleeping as a factor in missing visits. In [the court's] view, [Father] was doing just enough to remain on the reunification path; he was attending hearings and, over the life of the case, sporadically visiting with the child, but little more can be said in the name of performing parental duties. [Father's] visitation, inconsistent as it was, could not be said to be enough to provide for the emotional needs of a child, particularly so young as this child. [Father] would need to demonstrate the ability to safely care for the child in order to establish his ability to perform parental duties, via, at minimum, successful completion of parenting classes, the mental health evaluation, and domestic violence programming, none of which [Father] availed himself. Visiting the child when he was hospitalized for a week would have also been some indicator of a good faith effort to express interest in parenting the child and providing for the child's needs (emotional, medical, and otherwise).

(Orphans' Court Opinion at 7-9) (emphasis in original). The record supports the court's analysis and conclusions that for the six months prior to the filing of the termination petition, Father was not performing parental duties in any meaningful way. *See In re Z.P., supra*. As such, we discern no abuse of discretion in the court's determination that termination of Father's parental rights was warranted under Section 2511(a)(1). *See* 23 Pa.C.S.A. §

2511(a)(1). Thus, we need not address the remaining Section 2511(a)

subsections. *See In re Z.P., supra*. *See also In re B.L.W., supra*.

Relevant to Section 2511(b), the Orphans' Court observed:

> Finally, [giving] primary consideration to the developmental, physical and emotional need and welfare of the child, we found by clear and convincing evidence that termination best served the needs and welfare of [Child]. [Child] was under three years old at the time of the termination hearing. He had spent most of his life with his maternal aunt and other family in her home, to whom he is bonded. [The court was] was struck by [Father's] statement at the close of the evidence that "there is nothing that I wouldn't do for him .... I am going to get my stuff together," as the statement was belied by [Father's] efforts. As [the court has] discussed at length herein, [Father's] reunification goals have largely gone untouched since the inception of [CYS] involvement, and not for lack of ability. It is not apparent to [the court] why [Father] had not obtained a mental health evaluation or domestic violence treatment or why [Father] did not attend more visits than he did. It was apparent, however, that [Father] always **could** achieve these goals and had simply not—in part, apparently, because he had not obtained a driver's license for reasons unknown to all, or because of oversleeping, or not following up with providers suggested to him by [CYS,] or, evidently, not calling his insurance company to determine what providers would be covered sooner than after the first portion of the termination hearing. [Child] was outside of either parent's care for a year and a half at the time of the hearing; he was just one year old when he was placed with his aunt. At any time during that year and a half, when meeting reunification goals becomes most pressing, [the court] would expect and hope that a parent would make strides in efforts to reunify and recognize the urgency of a child's need for a parent willing to exert himself to make himself available to [Child]. This did not occur. [Child], meanwhile, desperately needs a home where his caregivers both want to do everything they can to provide a safe and loving home for him, and then, more importantly, conduct themselves in a way that demonstrates commitment to that desire. [Child] has found such a home

- 16 -

with his aunt, and his best interests lie in securing his permanency there.

(Orphans' Court Opinion at 10-11) (internal citations and footnotes omitted) (emphasis in original). The record supports the court's conclusions.

Although Father and Child interact well at visits, Father has visited only sporadically with Child since the inception of the dependency proceedings, is still on the call ahead protocol, and does not call on time. (*See* N.T. Hearing, 10/23/24, at 80-82). Child is bonded with his foster family and is happy in his placement. (*See id.* at 31-33, 95-96). It was the CYS case supervisor's opinion that termination was in his best interests and that Child would not be harmed by termination. (*Id.* at 63-64). Further, due to Child's young age, his legal counsel deferred to the guardian *ad litem*'s recommendation, but did note for the record that she visited Child in his foster home, and he is very happy there and appears bonded with his foster parents and extended family. (*See* N.T. Hearing, 11/23/24, at 12-13). Child's guardian *ad litem* recommended termination of Father's parental rights and noted that Child's best interests were served by adoption, and noted she had no concerns about any harm occurring to Child as a result of termination. (*See id.* at 13-14).

Further, nothing in the record indicates that Father and Child have a bond.[7] *See In re K.Z.S., supra*. Although Father expressed his love for Child

_____

[7] When asked whether Child had a bond with Father, Child's foster mother responded, "I really don't know. Because [Father] does not contact him. Like *(Footnote Continued Next Page)*

at the termination hearing, "a parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights." ***See Z.P., supra*** at 1121. As such, the record demonstrates that termination will best serve the needs and welfare of Child. ***See*** 23 Pa.C.S.A. § 2511(b); ***Z.P., supra***. Following our independent review of the record, we agree with counsel that the appeal is frivolous. ***See Dempster, supra***; ***Palm, supra***. Accordingly, we affirm and grant counsel's petition to withdraw.

Decree affirmed; counsel's petition to withdraw is granted.

Judgment Entered.

_____
Benjamin D. Kohler, Esq.
Prothonotary

Date: 05/29/2025

---

he asks for pictures like twice, and it was like spaced out .... I don't know really know." (***See*** N.T. Hearing, 10/23/24, at 96). Father testified that Child smiles and laughs during visitations, but did not testify specifically regarding any parent/child bond. (***See id.*** at 106). Father further testified that he loves his son but, notably, did not testify further regarding Child's love for him. (***See*** N.T. Hearing, 11/23/24, at 14).