J-S46031-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: D.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.D., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1130 WDA 2025 |

Appeal from the Order Entered August 13, 2025
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000168-2022

| | | |
|---|---|---|
| IN THE INTEREST OF: D.L.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.D., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1131 WDA 2025 |

Appeal from the Order Entered August 13, 2025
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000167-2022

| | | |
|---|---|---|
| IN THE INTEREST OF: D.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.D., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1132 WDA 2025 |

Appeal from the Order Entered August 13, 2025
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000169-2022

| | | |
|---|---|---|
| IN THE INTEREST OF: C.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

J-S46031-25

:
:
:
APPEAL OF: D.D., FATHER         :
:
:
:
:
:   No. 1133 WDA 2025

Appeal from the Order Entered August 13, 2025
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000170-2022

BEFORE:  BOWES, J., NICHOLS, J., and KING, J.

MEMORANDUM BY KING, J.:          **FILED: February 12, 2026**

Appellant, D.D. ("Father"), appeals from the orders entered in the Allegheny County Court of Common Pleas, Orphans' Court, which granted the petitions filed by the Allegheny County Office of Children, Youth, and Families ("CYF") for involuntary termination of Father's parental rights to D.L.D., Drl.D., Dry.D., and C.D. (collectively, "Children").[1,2]  We affirm.

A prior panel of this Court summarized the relevant facts and procedural history of this case as follows:

> [Parents] have six biological children: the four subject
> Children of these appeals, as well as Dn.D., born in 2012

---

[1] The parental rights of S.P. ("Mother") were also terminated as to all four Children.  On March 24, 2025, this Court affirmed the termination of Mother's parental rights to C.D.  ***See In the Int. of C.D.***, No. 685 WDA 2024 (Pa.Super. filed Mar. 24, 2025) (unpublished memorandum) (explaining that Mother filed timely notice of appeal from termination order concerning C.D. only).

[2] Many of the Children have the same initials.  Accordingly, to differentiate between them, we will refer to each child as follows: D.L.D. (born August 2013), Drl.D. (born August 2016), Drv.D. (born March 2019), and C.D. (born December 2020).

(the oldest child) and Di.D., born in 2015 (the third child). CYF has been involved with this family … since 2012 when it received and found valid a general protective services ("GPS") report of domestic violence.[4]

[4] At that time, Father and Mother had one child, Dn.D. At some point, she was adjudicated dependent, was placed in the care of Mother's mother ("Maternal Grandmother"), "never returned to either parent," and was adopted by Maternal Grandmother in 2015. Trial Court Opinion, 9/5/24, at 5.

Throughout this case, Father's court-ordered goals were generally to participate in drug and alcohol treatment, mental health treatment, and a batterer's intervention program, and to have visits with the Children.

The trial court has summarized the extensive procedural history of this matter. *See* Trial Court Opinion, 9/5/24, at 4-14. As we write for the parties and the trial court, who are familiar with this record, and we dispose of this appeal under subsection 2511(b), we need not engage in a detailed review of the entire case. Instead, we review the evidence relevant to our consideration of subsection 2511(b).

CYF initiated dependency proceedings for the Parents' second child, D.L.D., the same year she was born, 2013. By August 2014, Father was incarcerated.[5]

[5] Parents' third child, Di.D. — who is not a part of the instant appeals — was born in 2015. At some time, he was also adjudicated dependent and placed with a foster parent — whom Mother identified at the termination hearing as her father. *See* N.T., 5/3/24, at 102. At the time of the instant termination orders, Di.D.'s permanency goal remained reunification.

Drl.D. was born in 2016.[6]

[6] Around 2018, D.L.D. disclosed "inappropriate touching by Father. [D.L.D., Drl.D., and Di.D] were removed for a brief period, but ... returned to Mother's care by the time of the adjudicatory hearing in 2019." Trial Court Opinion, 9/5/24, at 6 (footnotes omitted).

- 3 -

However, at the underlying termination hearings, there was no explanation as to any investigation or ultimate finding of this disclosure. *See* N.T., 4/19/24, at 120.

Following Father's release from prison, the Parents resumed their relationship, and the IPV continued. Mother "obtained a Protection from Abuse Order ('PFA') against Father in December 2018. [H]e had already violated it twice by" March 2019, when the trial court adjudicated dependent D.L.D., then five years old, and Drl.D., then two years old. Drv.D. was born that same month. Eight months later, in December 2019, the trial court adjudicated Drv.D. dependent. "By the time of the August 2020 review hearing, ... IPV remained an ongoing issue. Father was again incarcerated due to a violation of the PFA and had been arrested for a separate violation in May." Trial Court Opinion, 9/5/24, at 8.

In September 2020, CYF obtained emergency custody to remove the Children from Mother's care. D.L.D., Drl.D., and Drv.D. were placed with Maternal Grandmother, and have remained in her care since then.

C.D., the youngest child, was born in December 2020. The trial court adjudicated him dependent in August 2021, when he was eight months old, and CYF placed him with his current foster parents.

> IPV between Father and Mother had resurfaced[.] Mother testified that she wished to terminate the PFA order[,] reconcile with Father[,] and reside together as a family. [T]he court had concerns regarding Mother's ability to maintain her safety in Father's presence, and a significant risk that C.D. could be exposed to further violence between Parents.

Trial Court Opinion, 9/5/24, at 9-10 (footnotes and unnecessary capitalization omitted).

The trial court further summarized:

> By the next review hearing in November 2021, Father was again incarcerated as a result of new criminal

charges for assaulting Mother. Over the next year, Father continued to be in and out of jail and failed to maintain consistent contact with CYF. IPV between Parents remained a concern and Mother was granted a second PFA against Father in April 2022. ...

Trial Court Opinion, 9/5/24, at 9-11 (footnotes omitted).

*Interest of D.L.D. et al*, No. 690 WDA 2024, No. 691 WDA 2024, No. 692 WDA 2024, No. 693 WDA 2024, unpublished memorandum at 1-5 (Pa.Super. filed Mar. 27, 2025).

On November 14, 2022, CYF filed petitions to terminate Mother's and Father's parental rights to D.L.D, Drl.D., Drv.D., and C.D. By January 2023, Father was again incarcerated, facing new criminal charges.

On April 19, 2024, and May 3, 2024, the trial court held bifurcated termination hearings. At the time of the second hearing, Mother was also incarcerated on new criminal charges and withdrew her challenge to the termination petitions relative to the three older children. This Court summarized the relevant testimony elicited at the hearings as follows:

CYF presented testimony that Father was released from prison in November 2023 and was required to comply with Justice Related Services ("JRS"), a program providing drug and alcohol treatment, mental health treatment, and short-term housing. *See* N.T., 4/19/24, at 12-13. As a part of this program, Father entered the Renewal Center, successfully completed it in January 2024, and then entered Skyline Recovery House, "a three-quarter house." *Id.* at 13; *see also id.* at 135. However, Father was also required to "enter dual diagnosis treatment at Pyramid," but failed to attend two intake appointments. As a result, Father "was unsuccessfully discharged from the JRS program." *Id.* at 13. Later that month, Father was "kicked out" of Skyline Recovery House for violating its rules. Consequently, Father was arrested in early March 2024 for a probation violation,

and remained incarcerated at the time of the April and May 2024 termination hearings. *Id.* at 14.

Stacy-Ann Wilson-Williams ("CYF Caseworker"), the assigned CYF caseworker since 2018, testified to the following. Father had not completed drug and alcohol or mental health treatment. He completed a batterer's intervention program while in prison, but even after completion of it, he had additional domestic violence incidents, which led to both PFA violations and criminal charges. *See id.* at 128-29. The final PFA order, issued in 2022, remained active, but Father had most recently violated it in November 2022.

With regard to visitation with the Children, CYF Caseworker testified to the following. Father had bi-weekly virtual visits at the Allegheny County Jail, from July to November 2023.[8] *See* N.T., 4/19/24, at 132, 137.

> [8] We note these visits post-dated the November 2022 filing of the termination petitions.

D.L.D. and Drl.D. participated, but Drv.D. "frequently [said] that she does[ not] want to have the visits," and at times "did[ not] want to face the camera." *Id.* at 138-39. CYF Caseworker observed one visit and testified that "it went well," and Father "was appropriate." *Id.* at 143.

As stated above, Father was released from the county jail in November 2023. One week thereafter, the trial court issued an order directing that: Father have weekly video visits with D.L.D., Drl.D., and Drv.D., to be "facilitated by" Maternal Grandmother; and possible in-person visits at the Renewal Center. N.T., 4/18/24, at 134-35. CYF Caseworker contacted the Renewal Center, but did not receive a response; however, the caseworker acknowledged that Renewal "usual[ly]" would not respond or provide information. *Id.* at 135-36. Meanwhile, CYF "lost contact" with Father. *Id.* at 136. CYF "implemented the Corporate Security Investigation to try to locate" him and contacted the probation department, who responded that he was at the Skyline Recovery House. *Id.* at 137. Caseworker Wilson-Williams then visited the Skyline Recovery House, but learned Father was no longer there. Father was

incarcerated again in March 2024. *See id.* at 132.

CYF Caseworker opined Father "had enough time to remedy the conditions that brought the [C]hildren into care," but he was not currently in a position to care for the Children, had "not made any progress with his court-recommended goals," continued to "exhibit" "violent" behavior, and was incarcerated multiple times throughout this dependency matter. *Id.* at 133-34. CYF Caseworker also stated there were no other services that CYF could offer Father. *See id.* at 133. We note the caseworker did not give any testimony as to whether there was a bond between Father and the Children, nor as to the effect termination would have on the Children.

CYF also presented psychologist Terry O'Hara, Psy.D. ("Dr. O'Hara"), as an expert in forensic psychology. He testified to the following. In 2023, Dr. O'Hara evaluated Father, who was then incarcerated, by video. Dr. O'Hara acknowledged there were "some limitations in conducting an evaluation in that format," and it is "qualitatively different to see someone face to face as opposed to virtually." N.T., 4/19/24, at 48, 92. Dr. O'Hara further explained he was not "able to administer the full psychological battery because [Father] was incarcerated," Dr. O'Hara could not "speak with any collateral sources," and Father could not "sign any releases ... due to incarceration." *Id.* at 50.

Nevertheless, Dr. O'Hara summarized his evaluation as follows. Dr. O'Hara diagnosed Father with unspecified depressive disorder; he did not "rule out opioid abuse," but noted "it needs to be ruled out." *Id.* at 150. Father "reported the Strattera [*sic*] to be helpful, [and] that was a positive. On the other hand, [Father] had a pretty extensive history of criminal activity," which included aggravated assault, simple assault, recklessly endangering another person, terroristic threats, harassment, retail theft, and trespass. *Id.* at 49. However, Father denied he had any prior convictions. *See id.* at 50.

Dr. O'Hara testified:

[Father did not] assume any responsibility for his circumstances. He reported a history of depression

and anxiety which was long-standing. He reported some auditory hallucination which had occurred ... "months ago[."] He reported psychiatric hospitalization the prior year due to depression, significant history of cannabis usage, benzodiazepine usage. He was using apparently two to four boxes of cough and cold medicine per day at that time[.]

[Father] acknowledged IPV in the relationship with [Mother]. According to [Father], the [C]hildren were exposed to argumentation, and domestic violence, ... "used to be all the time," … including ... physical violence and control. He reported the relationship with [Mother] to be toxic.

N.T., 4/19/24, at 49.

Dr. O'Hara conducted "interactional evaluation[s]" of D.L.D., Drl.D., and Drv.D. with Mother, as well as of those Children with Maternal Grandmother. *Id.* at 47, 52. Dr. O'Hara was "not sure" whether all the Children were aware that Father was incarcerated. *Id.* at 73. D.L.D. stated she last saw Father in 2021, and that "when he was in jail he looked different." *Id.* Drl.D. "stated she has not had visits with [F]ather and last saw [him] 'only in court.'" *Id.* Dr. O'Hara asked Drl.D. about her relationship with Father, and she replied, "[Z]ero percent. We don't even see him." *Id.* at 73, 98. Additionally, Dr. O'Hara completed an "interactional" evaluation of C.D. and his foster parents, and found the latter "were appropriate." *Id.* at 51. Dr. O'Hara opined that both foster homes would be appropriate long-term resources for the Children. *Id.* at 74.

Dr. O'Hara generally noted that it is "difficult for children to establish a meaningful relationship and secure attachment with a caregiver in the absence of consistent and quality contact." N.T., 4/19/24, at 55. However, Dr. O'Hara did not observe Father interact with the Children, and was not aware of how many visits he was to have under court order. *See id.* at 54, 92, 94. Dr. O'Hara was aware that CYF "report[ed] that Father interact[ed] well with the [C]hildren who attend[ed] virtual visits." *Id.* at 98. However, Dr. O'Hara opined:

- 8 -

> I'm not able to say anything about [Father's] parenting. ... I can say what the [C]hildren stated to me about [their] relationship with [F]ather, and I can speak hypothetically about the experience for children when they lack consistent meaningful contact with a caregiver.
>
> ... I'm not able to speak about detriment ... in a meaningful way without ... having any observation of the [C]hildren with [F]ather.

*Id.* at 93; *see also id.* at 89 (Dr. O'Hara testifying, "I'm obviously not able to comment upon detriment in relation to [Father] as I did[ not] observe him with the [C]hildren at any time").

Nevertheless, Dr. O'Hara concluded he had "concerns" about Father's potential unsupervised contact with the Children. N.T., 4/19/24, at 54. Dr. O'Hara opined that he "did not have evidence" that Father was "compliant with treatment or making progress," was "in any position to care for a child's needs and welfare at the time of [his] evaluation[,]" or "would be able to make progress in a reasonable amount of time." *Id.* at 54-55, 74. Dr. O'Hara reiterated that Father "lacked assumption of responsibility." *Id.* at 55.

Father testified to the following. He had virtual visits with the Children at the county jail from July through November 2023. The visits went "great," and they talked about school, activities, the Children's friends, and when Father would return home. N.T., 4/19/24, at 154. Drl.D. did not "really like the video visits" and "was a little distant." *Id.* D.L.D. had "great visits" with Father; she was "very bright," told Father "a lot of stuff about her friends and ... school," and "she really wants [Father] to be in her life a lot." *Id.* at 155. Drv.D., who is younger, said Father's "name over and over again," and Father played peekaboo with him. *Id.* Father similarly played with C.D.

Father acknowledged that he did not participate in drug and alcohol treatment or parenting classes. When asked why not, he responded, "I don't know. I wasn't really into it. I end[ed] up going to the Renewal Center to do my drug and

alcohol, so I finished drug and alcohol." *Id.* at 156-57. Father testified that he also "completed" mental health treatment at the Renewal Center, describing the treatment as "some lady ... would just come see me and ask me a bunch of questions." *Id.* at 157. When asked why he left the Skyline Recovery House, Father replied, "I had a recent loss in my family, and ... I ended up doing cannabis, and they [kicked] me out for that." *Id.* at 157-58.

Father opposed termination of his parental rights, stating: "I love my children, and I need to be in my children's [lives]. My children need me, and I need them." *Id.* at 159. When asked on cross-examination when he last "provided significant support for any of" the Children, Father replied that he gave them "some food stamps" earlier that year. *Id.* at 160.

*Interest of D.L.D., supra* at 5-12.

On May 11, 2024, the court entered decrees terminating Mother's and Father's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(2) and (b). On June 9, 2024, Father timely appealed. On March 27, 2025, this Court determined that the evidence of the record did not support termination of Father's parental rights. Specifically, this Court acknowledged that the trial court had thoroughly reviewed the evidence pertaining to subsection 2511(a)(2), but that Father's undisputed testimony regarding recent visits with Children was that they went well, and that CYF presented no evidence concerning the bonds between Father and each child, and whether termination of Father's parental rights would have any effect on each child's needs and best interests. Therefore, this Court remanded the matter so that the court could hear additional evidence relevant to a Section 2511(b) analysis. *See id.*

The court held additional hearings on July 29, 2025 and August 8, 2025. At the July 29, 2025 hearing, CYF presented the testimony of Heidi Hysong, the Children's permanency caseworker; Joseph Volkay, a respite caseworker with A Second Chance; Rozlynn Deicas, a caseworker supervisor at A Second Chance; Stacy-Ann Wilson-Williams, a CYF caseworker; Father; J.A., Children's grandmother and foster parent; and M.C., C.D.'s foster mother.

Ms. Hysong testified that she was assigned to the Children as a permanency caseworker in May 2023. (N.T. Hearing, 7/29/25, at 15-16). At the last meeting she had with the Children on June 10, 2025, Ms. Hysong asked D.L.D., Drl.D., and Dry.D. whether they wanted to continue visits with Father, and all three Children responded that they did not. (*See id.* at 17). All three Children stated that when Father had come to the home, he scared them. (*Id.* at 17-18).

Ms. Hysong testified that Children continue to do well, despite their lack of contact with Father, and that she believes Children should be adopted by their foster parent. (*See id.* at 18). Children live with their grandmother, J.A. (*Id.* at 30). Children appear bonded with J.A., and happy and content in the household. (*Id.* at 31). Ms. Hysong believed Children would be extremely upset and have a hard time adjusting if they were removed from J.A.'s home. (*Id.* at 31-32). Children want to be adopted and do not want contact with Father when they are adopted. (*Id.* at 35).

Ms. Hysong did not see evidence of a bond with Father. (*See id.* at 32). Children do not talk about him when they have visitation, other than, at the

last visit, stating that they were scared when Father showed up because they thought he was going to take them from the house. (*Id.* at 32-33, 35).

With respect to C.D., he is happy with his foster parents, who he calls Mom and Dad. (*See id.* at 27-29). C.D. is bonded with foster parents and would be devastated if that bond was broken. (*Id.* at 29-30). C.D. has never mentioned Father in any conversation and Ms. Hysong has never seen evidence of a bond with Father. (*Id.* at 30).

Mr. Volkay testified that he is C.D.'s caseworker with his foster parents. (*See id.* at 38). C.D. gets along very well with his foster parents and is happy in their home, and they meet all aspects of C.D.'s emotional and physical needs. (*Id.* at 40, 47). C.D. calls his foster parents "Mom" and "Dad," and is especially attached to M.C. (*Id.* at 41). Foster parents facilitate sibling visits and C.D. enjoys seeing the older Children. (*Id.* at 42). Mr. Volkay has never heard C.D. mention Father. (*Id.*).

Ms. Deicas testified that she is the three older Children's caseworker. (*See id.* at 48-49). Children are doing well in J.A.'s home and call her "Mom." (*Id.* at 50). To her knowledge, Children do not generally speak about Father, although D.L.D. stated she did not want to talk about him, and Children were scared when he came to the home. (*Id.* at 51). Ms. Deicas believes there is a fundamental bond between Children and J.A., and that it would harm Children if this bond were terminated. (*Id.* at 55-59).

Ms. Wilson-Williams testified that she is employed as a caseworker at CYF and is the direct services caseworker for Children. (*See id.* at 61). She

testified that Children do not ask for visits with Father and do not want to have visits with him; Children have not visited with Father since 2023. (**_Id._** at 64, 76). She also testified that C.D. looks to his foster mother for all of his needs and calls her "Mom." (**_Id._** at 74). Ms. Wilson-Williams testified that there is no evidence of a bond between Children and Father, and Children would not suffer any harm if Father's rights were terminated. (**_Id._** at 76-77). On the contrary, Children are bonded to and would suffer a significant loss if separated from their foster parents. (**_Id._** at 77-78).

J.A. testified that she is the foster mother for D.L.D., Drl.D., and Dry.D., and that she had previously adopted one of Children's older siblings. (**_See id._** at 115). J.A. testified that Father has had little contact with Children over the last year, either virtually or in person. (**_Id._** at 116). J.A. testified that she has a strong bond with each of the Children, who call her "Mom." (**_Id._** at 122-23). Children have never asked her for visits with Father and do not want visits with Father. (**_Id._** at 123-24, 133). J.A. did not believe Children had a strong bond with Father or that they would be harmed by termination. (**_Id._** at 148).

M.C. testified that she and her husband, G.C., are C.D.'s foster parents; he calls them "Mom" and "Daddo." (**_See id._** at 156, 158). M.C. testified that Father has not had visits with C.D. in two and a half years, when C.D. was around one and a half years old. (**_Id._** at 156-57, 163-64). M.C. and G.C. provide for all of C.D.'s needs and he would suffer if removed from their care. (**_Id._** at 158-59). C.D. has a relationship with J.A. and C.D.'s siblings and looks

forward to seeing them. (***Id.*** at 165-66). C.D. does not have a bond with Father. (***Id.*** at 168).

Father testified on his own behalf. Father testified that his relationship with all of the Children is "beautiful." (***See id.*** at 101-103). Nevertheless, Father admitted that he has not seen Children recently, and that "life" got in the way. (***Id.***)

On August 8, 2025, the court provided an on-the-record statement of reasons in support of termination. Ultimately, the court concluded that Father lacked a meaningful parental bond with Children and that it was in their best interests to terminate his parental rights. (***See*** N.T. Hearing, 8/8/25, at 14). On August 13, 2025, the court entered decrees terminating Father's parental rights.

On September 12, 2025, Father timely filed separate notices of appeal at each underlying docket and contemporaneous Pa.R.A.P. 1925(a)(2)(i) statements of errors complained of on appeal. On September 30, 2025, this Court consolidated the appeals *sua sponte*.

On appeal, Father raises the following issue for our review:

> Did the adoption court abuse its discretion and/or err as a matter of law in finding that CYF met its burden of proof by clear and convincing evidence that termination of Father's parental rights would best serve the needs and welfare of the minor Child[ren] pursuant to 23 Pa.C.S. § 2511(b)?

(Father's Brief at 5).

In his sole issue on appeal, Father argues that the trial court erred by

terminating his parental rights under Section 2511(b).[3] According to Father, CYF failed to present evidence concerning the bonds between Father and each Child, and whether termination of Father's parental rights would have any effect on each Child's needs and best interests. Father claims that evidence of a bond, or lack of evidence of a bond, is a factor the court may consider, but not the sole factor. Father insists that CYF failed to prove by clear and convincing evidence that termination was in Children's best interests as opposed to a permanent legal custodianship order. Father concludes termination of his parental rights was improper on these grounds, and this Court must grant relief. We disagree.

Appellate review in termination of parental rights cases implicates the following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

*In re Z.P.*, 994 A.2d 1108, 1115 (Pa.Super. 2010) (quoting *In re I.J.*, 972 A.2d 5, 8 (Pa.Super. 2009)).

> Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. … We must employ a broad, comprehensive review of the record in order

---

[3] Although Father initially challenged the trial court's termination under Section 2511(a)(2) in the previous appeal, Father now concedes that CYF met its burden of proof regarding termination under that subsection. (*See* Father's Brief at 9). Accordingly, we confine our analysis to Section 2511(b).

to determine whether the trial court's decision is supported by competent evidence.

*In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).

Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.

*In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa.Super. 2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *In re J.D.W.M.*, 810 A.2d 688, 690 (Pa.Super. 2002). We may uphold a termination decision if any proper basis exists for the result reached. *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. *In re R.L.T.M.*, 860 A.2d 190, 191[-92] (Pa.Super. 2004).

*In re Z.P., supra* at 1115-16 (quoting *In re Adoption of K.J.*, 936 A.2d 1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008)).

The court granted involuntary termination of Father's parental rights to Child on the following grounds:

### § 2511.  Grounds for involuntary termination

(a)  **General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the

following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2) and (b). "Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." *In re Z.P., supra* at 1117.

Under Section 2511(b), the court must consider whether termination will meet the child's needs and welfare. *In re C.P.*, 901 A.2d 516, 520 (Pa.Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying

close attention to the effect on the child of permanently severing the bond."

*Id.* Significantly:

> In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship.
>
> When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation.

*In re Z.P., supra* at 1121 (internal citations omitted).

Further, our Supreme Court has clarified that, in making a Section 2511(b) determination, a trial court must analyze: (1) whether the parental bond is "necessary and beneficial to the child;" (2) "the child's need for permanency and length of time in foster care;" (3) "whether the child is in a pre-adoptive home and bonded with foster parents;" and (4) "whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety and stability." *Interest of K.T.*, ___ Pa. ___, ___, 296 A.3d 1085, 1113 (2023). Moreover, the Court explained that, when reviewing the nature of the parental bond, a court must consider "whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *Id.* Importantly, the *K.T.* Court's decision is particularly relevant to an analysis of an existing parental-bond. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of

- 18 -

any bond analysis, therefore, necessarily depends on the circumstances of the particular case." **In re K.Z.S.**, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

Instantly, the court found that there is no meaningful bond between Father and any of the Children, as he had not seen Children in several years, and Children either did not ask for visits or explicitly stated they did not want visits with Father. Ms. Hysong, Mr. Volkay, and Ms. Wilson-Williams all testified that Father does not have a bond with Children and they would not suffer any detriment if Father's rights were involuntarily terminated. By contrast, J.A. and M.C. testified regarding Children's bonds with their foster families, stating that all Children would suffer detriment if removed from their adoptive resources. All witnesses, with the exception of Father, testified that foster parents meet all of Children's needs. Even Father did not testify that he has a bond with Children, stating only that his relationship with them was "beautiful." On this record, we discern no abuse of discretion in the court's determination that Children's welfare is best served by termination of Father's parental rights to Children. **See In re Z.P., supra**; 23 Pa.C.S.A. § 2511(b). Accordingly, we affirm.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


DATE: 02/12/2026